EDWIN A. LOMBARD, Judge.
liThe defendant, Grayling E. Jackson, appeals, arguing that the evidence is insufficient to support his conviction for aggravated battery, a violation of La.Rev.Stat. 14:34. After review of the record in light of the applicable law and arguments of the parties, the defendant’s conviction is affirmed.

Relevant Procedural History

The defendant was initially charged by bill of information with armed robbery with a firearm, attempted second degree murder, and felon in possession of a firearm. On February 18, 2014, the State amended the bill of information to charge the defendant with aggravated battery rather than attempted second degree murder. On February 20, 2013, after a three-day trial, the defendant was convicted only on the aggravated battery charge. The State charged him as a multiple offender and, after pleading guilty to being a second offender, the defendant was sentenced on June 5, 2014, to serve fifteen years at hard labor with credit for time served.

Applicable Law

Battery is statutorily defined as “the intentional use of force or violence upon the person of another,” La.Rev. gtat. 14:33, and “[a]ggravated battery is a |2battery committed with a dangerous weapon.” La.Rev.Stat. 14:34. Because aggravated battery is a crime of general intent, “the State need’only prove the offender must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.” State v. Wix, 2002-1493, *100 p. 9 (La.App. 4 Cir. 1/15/03), 838 So.2d 41, 47. Thus, “[u]nder general principies of accessorial liability ‘all parties [to a crime] are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan.... Acting in concert, each man then became responsible not only for his own acts but for the acts of the other.’ ” Wix, 2002-1493, p. 9, 838 So.2d at 48 (citations omitted); see also' La.Rev.Stat. 14:24 (“All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principals.”). In reviewing a defendant’s conviction as a principal, a reviewing court looks to evidence of actions preceding a given offense, during the offense, and after the offense. State v. Quac Tran, 08-1103, p. 9 (La.App. 4 Cir. 8/13/09), 18 So.3d 165, 170.

Standard of Review

In Louisiana, we review sufficiency of the evidence to support a conviction utilizing the Jackson v. Virginia standard wherein an appellate court must determine whether, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984) (citations omitted). Under this standard, a reviewing court may “impinge on the actual fact finder’s discretion only to the extent necessary to guarantee the fundamental protection of due process of law.’ ” State v. Marshall, 04-3139, p. 5 (La.11/29/06), 943 So.2d 362, 367 (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Thus, the Jackson standard “neither permits a reviewing court to second guess the rational credibility determinations of the fact finder at trial ... nor requires a reviewing court to consider the rationality of the thought processes employed by a particular fact finder in reaching a verdict.” Marshall, supra. Accordingly, the “focus of the inquiry ... necessarily remains on ‘not whether this jury should have found the evidence sufficient but whether any jury could have done so.’ ” Marshall, 04-3139, p. 6, 943 So.2d at 367 (citations omitted; emphasis in original).

Relevant Facts

It is undisputed that that the charges against the defendant in this matter arise out of an attempted drug transaction that took place on June 20, 2013, at the victim’s residence in the Audubon Pointe apartments in Algiers. It is also undisputed that the victim, Keithan Tolliver, was a marijuana dealer. The following evidence was adduced at trial.
Colleen English, the property manager of Audubon Pointe of Algiers, testified that on'June 20, 2013, she was pulling out of the leasing office onto the main drive of the property when a dark silver Dodge sedan almost hit her vehicle. Ms. English attempted to follow it to get the license plate, but was unable to catch up with the Dodge because it was moving at a high rate of speed. Ms. English saw a man on the side of the road in red shorts and a white tank jump out of the way when the Dodge attempted to hit him. She observed a man in the backseat of the Dodge with mid-length dreadlocks, wearing a black hat and a yellow shirt, hanging out the rear driver’s side window. According to Ms. English, the man with red shorts was very frantic after the incident and trying to leave in a white 1980s sedan. When asked, he denied knowing the man who tried to hit him with the car. |4Ms. English called the police and, upon their arrival, discerned that man with the red *101 shorts (Mr. Tolliver) leased the apartment at 4121 Maple Leaf. Ms. English identified photographs of the victim’s apartment and testified that the photographs accurately portrayed the apartment as it existed on June 20, 2013. She noted' that that the pictures show blood on the door frame of the apartment, on the doorknob, on the couch in the living room, in the hallway-near the breaker-box and under the thermostat, and on the corner wall near the entrance to the kitchen.
On cross-examination, Ms. English conceded she did not hear shots fired, but that she explained that her radio was on and she was talking on the phone with a friend at the time of the incident.
Latanya Doubout testified that in June of 2013, she lived at 4121 Maple Leaf Drive with her two children and boyfriend, Mr. Tolliver, a marijuana dealer. On the day of the incident, Ms. Doubout was upstairs with her two children when Mr. Tolliver went downstairs to meet a man known as “Brian,” subsequently identified by Ms. Doubout in open court as the defendant. She heard three people conversing downstairs, including Mr. Tolliver and the defendant. Ms. Doubout testified that she heard the defendant say “Get down on the floor. N* * ⅜ ⅜ get down on the floor” and then heard someone being hit with a gun or being pistol whipped. Upon hearing what was apparently a physical altercation, Ms. Doubout moved her children into the bathroom and closed the door, but returned to the door of the bedroom to listen. She then overhéard the defendant tell Mr. Tolliver to walk to the door, followed by sounds of the back gate being kicked open. After determining that no one was present, Ms. Doubout went downstairs and walked outside. Mr. Tol-liver was standing in the middle of the street but, as she watched, he backed to the side of the street to avoid the approaching gray Dodge Charger, |-According to Ms. Doubout, the Dodge Charger slowed down and the defendant fired shots out of the rear window, hitting Mr. Tolliver. She estimated that she heard five or six gunshots. Ms. Doubout was unable to identify the driver of the Dodge Charger or the other passengers. After the incident, Ms. Doubout checked on her children and Mr. Tolliver was taken to the hospital.
On cross-examination, Ms. Doubout testified that she had known the defendant for a couple of months and had seen him at the apartment three to four times. She conceded that she did not speak with the defendant frequently and was only in his company once or twice as he primarily dealt with Mr. Tolliver. She insisted, however, that that she saw the defendant hanging out of the car’s rear passenger window and shooting at Mr. Tolliver.
On redirect, Ms. Doubout conceded that things were hectic and happening fast when she ran outside. She did not remember describing the man who shot at Mr. Tolliver to the police as wearing a yellow shirt. Ms. Doubout testified that she heard the defendant’s voice when he previously came to the apartment and, accordingly, on the day of the incident she recognized his voice. She stated that she did not recognize the other voice inside the apartment.
Willie Stovall testified that he is Ashley Shields’s cousin and that she had a boyfriend who she referred to as “Grennan.”[1] Mr. Stovall .testified that, prior to the incident on June 20, 2013, he agreed to rent a *102 car on their behalf because Ms. Shields had wrecked her car and neither she nor “Grennan” had a bank card. Mr. Stovall identified the rental car receipt and stated that, after he picked the car up the airport, he gave it to Ms. Shields and “Grennan” to use for a couple of days. | (iMr. Stovall testified that he spoke with “Grennan” on the phone the week he rented the car and, thus, when interviewed by the police about the June 20, 2013, incident, he wás able to provide them with “Grennan’s” number from his call log. The statement he provided to the detectives was played to the jury. The phone number that Mr. Stovall had for “Grennan” was 504-230-4753.
Detective Jason Hickman of the New Orleans Police Department (NOPD) testified that he investigated the armed robbery at 4121 Maple Leaf Drive on June 20, 2013. He went directly to the hospital upon being advised by dispatch that the victim had been taken there. When he arrived at the hospital, the victim was conscious and alert. Detective Hickman stated that the victim had a large laceration on the back of his head and a gunshot wound in his backside. After he spoke with the victim, Detective Hickman went to the scene of the crime. He identified various photographs of the scene, including one showing the inside of a dishwasher with a scale and a bag of green vegetable matter. Detective Hickman stated that he also found the victim’s cellphone inside the apartment and identified the phone in open court. He testified that he was able to access the contents of the cellphone by using the passcode 6994. From the call log he was able to determine that there were multiple telephone calls and text messages from a person listed as “Brian” with 504-230-4753 as the phone number. Photographs of the phone calls and text messages were identified by Detective Hickman.
Detective Hickman testified that, after learning the phone number of the perpetrator, he ran it through “COPLINK,”' a database police used to retrieve information of suspects and victims. Detective Hickman identified the report 17generated from the COPLINK database in court. The report showed that the phone number associated with “Brian” belonged to Grayl-ing Jackson. It also contained a physical description of the defendant, his birthdate, and that indicated he lived at 8626 Apple Street. Accordingly, Detective Hickman constructed a six-person photographic lineup and asked another officer, Detective Amy Robinson,, to show the lineup to the victim pursuant to NOPD policy. Based on the victim’s identification of the defendant in the lineup, Detective Hickman applied for an arrest warrant.
Detective Hickman testified that he spoke to several witnesses, including the victim’s wife or girlfriend, Ms. Doubout, and the manager of the property, Ms. English. .After obtaining the arrest warrant, he advised Detective Robinson to construct a search warrant for the defendant’s residence and informed her that money had been taken from the victim and that a firearm was used.
Detective Hickman was informed that they were not able to apprehend the defendant at his residence but was advised that the car used the day of the incident was rented from Hertz. Accordingly, he obtained a subpoena for Hertz’s records and learned that Mr. Stovall was the individual who had rented the car involved in the robbery and that the vehicle was a gray Dodge Charger. He identified several photographs taken of the vehicle and the receipt found and confiscated from the rental car.
Detective Hickman testified that a few days after the incident, he spoke with the defendant and that the defendant did not *103 have any obvious injuries that would indicate involvement in a struggle. After being advised of his Miranda rights, the 18defendant gave a statement which was played for the jury.[2] On cross-examination, Detective Hickman conceded that the defendant declared in his statement that he did not know anything about an armed robbery that occurred on June 20, 2013. He also conceded that the defendant had turned himself into the police and voluntarily gave his statement. Detective Hickman testified that he did not learn of a drug deal occurring prior to the incident when he spoke to Mr. Tolliver at the hospital and only learned later from officers at the scene that marijuana had been found at the apartment on Maple Leaf Drive.
Jim Huey testified that he works at the Orleans Parish Sheriffs Department and is the custodian of records of inmate telephone calls. He stated that the phone calls of the inmates are recorded on an internet-based system and stored on secured database. Mr. Huey testified that when an inmate makes a call he has to use a pin/folder number that was issued to the inmate at booking. He stated that frequently inmates do use a different inmate’s number to make a phone call. Mr. Huey testified that he could, however, find out the real identity of the inmate by listening to the recording because often times either the inmate or the other party to the conversation reveals his name. He stated that, while retrieving the phone calls pursuant to the district attorney’s request, he discovered that (in addition to his own number) the defendant was using the folder number of another inmate, Mr. Weems. Mr. Huey identified the call recording discs the district attorney requested, He stated that 2861729 was the defendant’s legitimate folder number and that 2359873 was Mr. Weem’s number. The recordings made by the defendant under both folder numbers and the corresponding call sheets were |„offered into evidence. . Mr. Huey acknowledged that the call sheets assigned to the defendant’s number and Mr. Weem’s number show that the phone call was made to 504-296-3328.
Ashley Shields testified that the defendant is her boyfriend and that in June 2013 they lived at 8626 Apple Street. She stated that Mr. Stovall is her cousin and that he rented a gray Dodge Charger for her and the defendant. Ms. Shields asserted that on June 20, 2013,’ the defendant and his cousin, Tyron, left the Apple Street house together at 11:00 a.m. and that the defendant dropped Tyron off before he went to see his sister. She stated that the defendant did not pick up Tyron the day' of the incident because Tyron had spent the night at their house.
According to Ms. Shields, the police came to their house on Apple Street on June 21, 2013, with a search warrant. She did not recall specifically telling the police the time the defendant left the house on June 20, 2013, but did tell them that the defendant returned home around one o’clock later that day. Ms. Shields stated that the defendant had told her that he had left to see his sister, Venetia, who was visiting from Texas. She admitted that she did not actually know if the defendant went to see his sister because she was not with him at the time. Ms. Shields testified that the defendant did not tell her he was going to pick up anyone prior to visiting his sister. Ms. Shields admitted that she did not tell the police that Tyron was with the defendant when he left her house on the morning of June 20, 2013.
*104 Ms. Shields admitted that the defendant had called her from jail on February 14, 2014. She, the defendant, and the defendant’s sister, Venetia, were on the call. | ipThe tape of the referenced conversation was played for the jury.[3] She admitted that in the February 14, 2014, recording, the defendant stated that “if push comes to shove” he was going to have Tyron state that he went to pick him up at 10:30 a.m. and then went to his sister’s on the day of the robbery.
Ms. Shields testified that she was unaware of the victim’s personal information prior to trial, but conceded that she used his birth date to find out from a bail bondsman if the victim was in jail and that she had learned the victim’s birthdate in a telephone conversation with the defendant on February 17, 2014. Ms. Shields did not recall the defendant instructing her to obtain the information as to whether the victim was in jail because “if there was no victim, there’s no crime.” The tape recording of February 17, 2014 was played for the jury.[4] After listening to the recording, Ms. Shield remembered the conversation. She stated that in June of 2013, the defendant had a cellphone but, because it was broken, he used her cellphone from June 17 to June 21, 2013.
I^On cross-examination, Ms. Shields conceded that she was not with the defendant between 11:00 a.m. on the day of the incident and knew nothing about the events at 4121 Maple Leaf Drive. Ms. Shields stated that she was nervous when the police conducted the search because they pulled guns on her but that she had answered the officers to the best of her ability.[5]
Detective Amy Robinson testified that she participated in the investigation of the robbery and shooting that occurred on Maple Leaf Drive on June 20, 2013, and, at Detective Hickman’s request, conducted the photographic line-up wherein the victim identified the perpetrator. After informing Detective Hickman that the victim *105 had identified the defendant as the perpetrator, Detective Robinson prepared a search warrant for the address associated with the defendant in the COPLINK database. She identified both a copy of the six-person lineup and the search warrant. Detective Robinson testified that she was present when the search warrant was executed and that she spoke with a black female named Ashley at the residence. She stated that during her investigation she was never informed that the defendant’s cousin Tyron had been at the Apple Street home or that they had left the house at 10:30 a.m. on June 20, 2013. Detective Robinson asserted that none of the officers conducting the search warrant put firearms in Ms. Shields’ face. She testified that during the course of her investigation she learned the telephone number of the defendant and, after reviewing the police report, confirmed that his phone number whs 504-230-4753.
On cross-examination, Detective Robinson conceded that she conducted the photographic line-up procedure with the victim at Orleans Parish Prison. She did |12not know that the victim was arrested for marijuana found in his apartment. Detective Robinson stated that after identifying the defendant, the victim circled, initialed, and dated the photograph. The victim also wrote a brief statement on the back of the line-up. Detective Robinson conceded that before applying for the search warrant she had been informed that money was owed to the victim and that the defendant was going to pay off the debt. She stated that the search warrant was to obtain a weapon and possibly a cell phone. Detective Robinson testified when she applied for the search warrant, she had no information related to a drug deal.
Mr. Tolliver testified that he had prior convictions for possession of marijuana and possession with the intent to distribute, noting that the second conviction was related to the marijuana found in his apartment on June 20, 2013. Mr. Tolliver stated that, as part of his plea deal, the State agreed not to file a multiple bill against him in exchange for his cooperation in this ease. He stated on the day of the incident he woke up around 10:00 a.m. and later received a phone call from “Brian” because “Brian” was coming to purchase marijuana. Mr. Tolliver identified the defendant in open court as the man he knew as “Brian.” He also identified his cell phone and photographs taken of the text messages he exchanged with the defendant. Mr. Tolliver noted that on June 19 and June 20, he and the defendant exchanged text messages about purchasing two ounces of high grade marijuana for $550.00. Mr. Tolliver admitted that in his initial interview with the police regarding the events on June 20, 2013, he did not inform them that the incident began with a marijuana transaction or that he was a drug dealer.
Mr. Tolliver testified that the defendant arrived at his apartment at “10-some-thing” in the morning and, although the defendant normally came alone, the day of the incident he arrived with a second person. Once the two men were inside 113the residence, Mr. Tolliver went to retrieve the marijuana out of the dishwasher and then placed three grades of marijuana on the kitchen table. He also placed cash on the table because the defendant indicated that he had $600 and needed change. Mr. Tolliver testified that, as he turned around from placing the money on the table, the defendant grabbed his left wrist/arm, put the gun in his face and ordered him to “give it here.” He stated that he “tussled” with the defendant for a minute and the second individual grabbed the cash and marijuana. The defendant and his companion then attempted to make him lie down on the ground and when he refused, *106 the companion hit Mr. Tolliver twice on the head with a pistol. The defendant held Mr. Tolliver’s arm while his companion ran out the back door of the apartment with the marijuana and money. According to Mr. Tolliver, even after his companion left, the defendant continued to hold his arm, threatened him, and attempted to pull him outside. He stated that he told the defendant that “he got what you got, go ahead on about your business.” Eventually, the defendant gave up and also exited the back door. Mr. Tolliver stated that he then ran out of the front door, approached a man in a Dodge Charger and asked him if he had a gun. After the man in the car shook his head no, Mr. Tolliver noticed the defendant and his companion coming from around the back and approaching the car. Mr. Tolliver, realizing that the man in the Dodge Charger was another accomplice of the defendant’s, ran back towards his house. The defendant and his companion got into the Charger and drove off towards a dead end. Mr. Tolliver went to a neighbor’s house in the attempt to get a gun but, unsuccessful, went back outside and stood in the middle of the street, knowing that there was only one exit/entrance. The Dodge Charger reappeared and began driving towards him. The defendant’s companion leaned outside the rear passenger window and started fyshooting at him. Mr. Tolliver testified that the defendant was in the front passenger seat. He estimated that seven shots were fired. Mr. Tolliver was hit with one bullet in right hip as he ran for cover. He testified that the Dodge Charger continued driving in the direction of General DeGaulle Drive and that a neighbor subsequently drove him to the hospital.
Mr. Tolliver identified the photographic line-up, wherein he marked the defendant as individual he knew as Brian. He identified photographs of his injuries resulting from the incident, including a picture of a laceration on his head and gun wound on his side. Mr. Tolliver testified he was wearing red shorts and a white tank top on June 20, 2013. The clothing was introduced by the State into evidence and Mr. Tolliver pointed out the blood stain on the tank top arid the bullet hole in the top portion of the shorts.
On cross-examination, Mr. Tolliver admitted that on the back of the photographic line-up he wrote that the incident stemmed from a $200 bet. Specifically, Tolliver wrote “We bet on a playoff series $200 a game. He didn’t want to pay, came over to the . house with a pound of weed trying to sell it to me and I told him I wanted my money.” Mr. Tolliver testified that he could not remember the make of the defendant’s gun, but that it was silver and looked like a .380 handgun. He stated that he was certain that it was the defendant’s companion, not the defendant, who shot at him from the rear passenger window.
Mr. Tolliver stated that, prior to being transported to the hospital, he told his girlfriend (Ms. Doubout) that he had been shot. He conceded that- the story he gave to the police at the hospital on the day of the incident (that the shooting arose over a $200.00 bet) was false. Mr. Tolliver stated that he gave the false story because he did not want to admit to selling marijuana. He asserted, however, that his court 11fitestimony was the truthful version of the events of June 20, 2013. Regarding his plea deal, Mr. Tolliver acknowledged that he agreed to testify against the defendant in exchange for the State agreeing not to file a multiple bill against him on the possession with the intent to distribute marijuana conviction and that, had he been charged as a multiple offender, he faced fifteen years of prison. Mr. Tolliver also conceded that, in his exchange for his tes *107 timony against the defendant, he was on probation rather than in jail after pleading guilty to possession with intent to distribute. The defense offered into evidence the guilty plea form signed by Mr. Tolliver evidencing the agreement that the State would not file a multiple bill “on the condition of cooperation.”
On redirect, Mr. Tolliver testified that, when he entered into the plea agreement with the State, he was represented by an attorney and, therefore, the district attorney spoke to him through his attorney. He stated that his attorney just asked him to testify as to what happened on June 20, 2013, and did not instruct him as to what to say. Mr. Tolliver also testified that his ■ attorney was a public defender and had no knowledge about the details of the armed robbery prior to the being assigned to the case. He asserted that the district attorney told him to testify truthfully as to the events and that he had done so.
Officer Joseph Pollard, a fingerprint expert, testified that he took the defendant’s fingerprints on the morning of trial and identified the fingerprint card, dated February 19, 2014. He also identified a certified copy of a fingerprint card taken on June 23, 2011 and certified package of a conviction in Case No. 507-267. The certified pack showed that the defendant pleaded guilty to possession of intent to distribute marijuana on August 26, 2011. After reviewing the two fingerprint cards and the certified package of conviction, Officer Pollard opined that the | ^defendant was the same person who was previously convicted of possession of intent to distribute marijuana. The cards and the certified pack were published to the jury.[6]
At the conclusion of Officer Pollard’s testimony, the State offered, filed, and introduced all of its exhibits, including, the 911 audio tapes and corresponding incident recalls; photographs of the Maple Leaf Drive apartment; the Hertz rental receipt; Mr. Stovall’s audiotaped statement; a copy of the COPLINK report; the application for an arrest warrant for the defendant; the subpoena duces tecum to Hertz; the photographs of the rental car; the cell phone; photographs of the text messages; the rights of the arrestee form; the audio tape of the defendant’s statement; the audio of the defendant’s jailhouse phone calls and call detail sheets; audio recording of the lineup procedure; the photographic lineup; application for search warrant; a Google image map of the apartment complex; photographs of Mr. Tolliver’s injuries; Mr. Tolliver’s clothing; fingerprint cards taken of the defendant on February 19, 2014 and June 23, 2011; and a certified package of the defendant’s prior conviction in Case No. 507-267.
The defense recalled Detective Hickman, who testified that on the day of the incident, Mr. Tolliver told him that the defendant came to his (Mr. Tolliver’s) house to settle a bet. Further, Mr. Tolliver told him that the defendant gave him $200 but when he (Mr. Tolliver) pulled out his money clip to add the $200 to it, the defendant pulled out a handgun and demanded money. Mr. Tolliver told Detective Hickman that the defendant then struck him in the back side of the head and he fell to the floor, at which point the defendant removed the money clip from Mr. Tolliver’s pocket. Mr. Tolliver described the gun that had hit him as a black .380 |17handgun. He also indicated that after the robbery he ran out into the street, not to a neighbor’s house. Mr. Tolliver also stated to Officer Hickman that the defendant’s companion was hanging out of the rear window of the driver’s *108 side and that the companion fired three to four shots at Mr. Tolliver.
The defendant testified on his own behalf that he turned himself in after learning that the police had come to his house looking for him. He admitted that in his statement he told Detective Hickman that his phone was stolen because he was afraid of why the police wanted him. The defendant asserted that, in reality, he was using his girlfriend’s phone because his was broken. The defendant stated that he told the detective that he was not aware of any armed robbery because nothing was taken from the apartment. He admitted that in the jail cell tape he asked his girlfriend to check on Mr. Tolliver, but claimed that was his trial had previously been continued due Mr. Tolliver’s absence and therefore he wanted to know if the trial was going to go forward. The defendant stated that he said if “there’s no victim, there’s no crime” because he wanted the trial to be finished. He acknowledged that on the tape his sister, Venetia, asked him to use her as an alibi at the time of the incident, but admitted at trial that he was not with his sister on June 20, 2013. The defendant stated that he does not have an alibi defense and was not with his sister or dropping off Tyron when the incident occurred at 4121 Maple Leaf.
The defendant testified that he spoke with Mr. Tolliver about purchasing marijuana on June 19, 2013, but that “things didn’t go through.” On June 20, 2013, however, he received a call from an individual in the neighborhood known as “B” who wanted to buy the marijuana. The defendant stated that he drove “B” over to Mr. Tolliver’s house for the gas money and was not aware that “B” had a |1Rgun on him. He also stated that he himself did not have a gun. The defendant said that when they arrived at Mr. Tolliver’s apartment, they were invited inside and “B” began negotiating the drug transaction with Mr. Tolliver while the defendant text-ed his girlfriend. The defendant stated that “B” and Mr. Tolliver began to argue after “B” accused Mr. Tolliver of shorting him on the marijuana. According to the defendant, Mr. Tolliver got aggressive and the men “tussled” over the sofa. As he was about to break up the fight, “B” said “He [Tolliver] got a gun.” Accordingly, the defendant ran out of the front door- and jumped in the front seat of the Dodge Charger. The defendant testified that on a previous occasion, he had seen Mr. Tol-liver with a gun.
Once in the car, the defendant saw “B” running out of the apartment with Mr. Tolliver chasing him. “B” jumped in the backseat and they drove off but had to double back because it was a dead-end street. As they returned, the defendant observed Mr. Tolliver standing in the street with a gun. He put his head down and heard several gun shots. After dropping “B” off, they went to his [the defendant’s] sister’s house. He stated that neither he nor “B” hit Mr. Tolliver on the head, nor did they take anything from him.
On cross-examination, the defendant admitted that he previously told the investigating detective that he was never in a gray Dodge Charger. He also admitted that it was a lie when he told Detective Hickman that his phone was stolen. He reiterated that he communicated with Mr. Tolliver on June 19 and June 20 of 2013 to purchase weed. The defendant asserted that, although his phone was broken on the day of the incident, he was able to text his girlfriend Ashley because the texts were still functioning. He also stated that he could make calls to anyone | lflin his recent call log.[7] The defendant testified that he *109 did not see Mr. Tolliver get hit over the head with a gun or get shot, but indicated that “B” must have done the shooting. He admitted to using someone else’s folder number when he called from jail on February 17, 2014. The defendant stated that when his sister said in the tape that he should say he was with her during the time of the incident, he said it was a “no go” because a jury would not believe someone to whom he is related.[8] He also stated this comment was to dissuade his sister from lying on the stand. The defendant agreed that he spoke with Tyron on the phone[9] and told him to say that that on June 20, 2013, he was dropping him off because it was the truth. He indicated that although he did in fact drop Tyron off at his house near the time of the shooting, he thought it would be helpful if Tyron corroborated. When Tyron responded on the recording that he could not “remember all that” and that the defendant had to “write it down,” the defendant explained it was because Tyron was “slow.” The defendant stated that although Mr. Tolliver’s phone shows that the defendant was communicating with Mr. Tolliver, it was “B” who was going to purchase the marijuana.
After offering Mr. Tolliver’s guilty plea form into evidence, the defense rested.

Errors Patent

A review of the record for errors patent reveals none.
| gsfliscussion
In his only assignment of error on appeal, the defendant argues that the evidence is insufficient to support his conviction for aggravated battery. Specifically, the defendant claims that the State failed to prove that he “adverted to the prescribed criminal consequences as reasonably certain to result” from anything he did or failed to do on June 20, 2013. The defendant contends that in finding him not guilty of armed robbery and possessing a weapon, the jury necessarily rejected the victim’s testimony that the defendant and his companion robbed him at gun point and, therefore, his conviction for aggravated battery cannot stand because the victim’s trial testimony does not support it.
Accordingly, the defendant does not deny that Mr. Tolliver was injured as a result of an aggravated battery, only that he [the defendant] directly caused the injury. As the defendant concedes in his brief, Mr. Tolliver testified at trial that (1) he negotiated the drug transaction with the defendant; (2) the defendant arrived with a companion and, after marijuana was placed on the table, the defendant told Mr. Tolliver that he needed change; (3) after Mr. Tolliver place $600 on the table, the defendant grabbed him by his arm and pointed a gun in his face; (4) the defendant and Mr. Tolliver “tussled” until the defendant’s companion hit Mr. Tolliver over the head with a pistol; and (5) after the defendant’s companion exited with the marijuana and money, the defendant continued to hold Mr. Tolliver’s arm, trying to force him outside and threatening to shoot Mr. Tolliver, his girlfriend, and her kids. In addition, the defendant testified at trial that (1) he negotiated a drug transaction with Mr. Tolliver; (2) he took “B” to Mr. Tolliver’s apartment to buy drugs; and (3) *110 he knew Mr. Tolliver, a drug dealer, possessed guns because he had seen them in previous transactions.
121 This evidence, which the defendant concedes, taken as a whole and in the light most favorable to the prosecution, shows that the jury’s decision to convict the -defendant as a principal for aggravated battery was a rational one. It is undisputed that the victim was injured in the shooting arising out of the drug deal in which the defendant was a principal. Thus, the defendant’s contention that he was not a principal to the aggravated battery because he could not have known of anticipated that a fight would occur or that his companion would feel compelled to shoot at Mr. Tolliver is untenable. Drug deals, drug transactions, and drug dealers are inherently dangerous and, accordingly, the defendant’s contention that he did not know that a fight or gunplay might occur in the midst of a drug deal with a drug dealer who he knew had a gun is unpersuasive. See Smith v. U.S. 508 U.S. 223, 240, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (acknowledging inherent connection between illegal drugs and violence); State v. Webb, 13-1681, p. 10 (La.5/7/14), 144 So.3d 971, 978-979 (compelling public safety interest in preventing simultaneous possession of illegal drugs and firearms because of violent behavior endemic in drug trade); see also Wix, supra, (co-perpetrator fired shot that struck the victim but defendant’s participation in robbery constituted sufficient evidence to support defendant’s conviction for aggravated battery).
The defendant was a principal in an inherently dangerous activity that resulted in the victim’s injury. The victim testified that it was the defendant who grabbed his arm, put a gun in his face, ordered him “to give it here,” and, after the defendant’s companion struck him on the head, it was the defendant who attempted to pull him outside. In light of Wix, this is sufficient evidence to support the defendant’s conviction for aggravated battery. Moreover, Ms. Doubout testified that it was the defendant who shot at the victim from the rear passenger seat of the |22Dodge sedan. This alone, if found credible by the jury, is enough to support the defendant’s conviction.

Conclusion

The defendant’s conviction is affirmed.
AFFIRMED.
LANDRIEU, J., Concurs in the result.

. After listening to the audio recordings of the jail cell phone calls, it appears that the defendant is ''Grennan'' because when Ms. Shields refers to the defendant by his name, Grayling, it sounds slightly like "Grennan.”

. In the audio recording, the defendant denied being at 4121 Maple Leaf on June 20, 2013, and stated that he knew nothing about an armed robbery. He also stated that his cellphone was stolen approximately a month ago when he was at McDonald’s.

. There are multiple recordings from February 14, 2013 tape. In the first call, the defendant asked if Ms. Shields knew if Mr. Tolliver was in jail. In the second call, the defendant spoke with Ms. Shields and Tyron about having Tyron come to court and state that the defendant dropped him and “Pig'’ off at around 11:00 a.m. on June 20, 2013. In the third call, Shields warned the defendant about talking on the phone about the case, and the defendant indicated he did not use his folder number to initiate the call. In the fourth recording, the defendant’s sister (Vene-tia) advised the defendant to say “you wasn't there ... you was with me” and not to deviate from this story. The defendant also stated in the tape that "if push comes to shove” Tyron could.testify that he had dropped him off at 10:30/11:00 a.m. the morning of June 20, 2013. The fourth call was the recording that the jury heard at this point in the proceedings.

. In the first track of February 17, 2014 tape, the defendant talked to Ms. Shields about calling the bail bondsman to see if Tolliver posted bail. He also stated that the story with his sister, Venetia, is a "no-go” and that he is going to testify that Mr. Tolliver was the aggressor; he was just trying to get away; and' that when the gun shotá occurred, he just put his head down and kept driving. In the second call, Ms. Shields indicated that she could not find out information about Mr. Tolliver without his birthdate. The defendant informed her Mr. Tolliver’s birthday was May 26, 1975, and admitted that he was using a different folder number. In the third call, the defendant stated that he had read in the paper that "where there’s no victim, there’s no crime” and that was what he was hoping for. Ms. Shields advised him that Mr. Tolliver was released from jail on February 16, 2014. The fourth call was to a woman, perhaps the defendant’s sister, asking her to confirm that the information Ms. Shields gave him regarding Mr. Tolliver was correct.

.She testified on direct examination that when the police executed the warrant and searched for the defendant at their home, the officers pulled guns on her.

. The jury was not allowed to view the docket master, however, of the conviction package.

. The defendant also testified that on the day of the incident he had both his cell phone and *109 his girlfriend's cell phone on him. If he needed to call someone he would use his girlfriend’s cell.

. In reality, the defendant did not tell his sister it was a "no go.” The phone conversation he had with his sister occurred on February 14, 2013. See, n. 6. He made that statement when he was speaking with his girlfriend, Ms. Shields, on February 17, 2013. See n. 7.

. The telephone conversation with-Tyron occurred on February 14, 2013. See n. 6