STATE OF LOUISIANA       *       **NO. 2023-KA-0552**

VERSUS       *

CAIDEN J FRUGE       *       **COURT OF APPEAL**

      **FOURTH CIRCUIT**

      *       **STATE OF LOUISIANA**

**\* \* \* \* \* \* \***

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 549-711, SECTION "L"
Judge Angel Harris,
\* \* \* \* \* \*
**Judge Joy Cossich Lobrano**
\* \* \* \* \* \*

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge
Rachael D. Johnson)

Jason R. Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary Phillips
Assistant District Attorney
Orleans Parish District Attorney's Office
619 South White Street
New Orleans, LA 70119

     COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE


Rachel I. Conner
Grace N. Bronson
LAW OFFICE OF RACHEL I. CONNER
3015 Magazine Street
New Orleans, LA 70115

     COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**

**APRIL 11, 2025**

This is a criminal case. Caiden Fruge ("Defendant") appeals his convictions of manslaughter and conspiracy to commit armed robbery and his sentences on each conviction. For the following reasons, we affirm the convictions and sentences.

## PROCEDURAL HISTORY

On August 20, 2020, an Orleans Parish Grand Jury returned an indictment against Defendant, charging him with one count of second degree murder, a violation of La. R.S. 14:30.1; five counts of attempted second degree murder, a violation of La. R.S. 14:(27)30.1; and one count of conspiracy to commit armed robbery, a violation of La. R.S. 14:(26)64.[1] The case proceeded to trial against Defendant on October 18, 2022 on the counts of second degree murder and conspiracy to commit armed robbery.[2] At the conclusion of the trial, the jury

---

[1] The indictment also charged Alec Billiot, Arec Billiot, and Tyrin Barraza each with second degree murder, five counts of attempted second degree murder, and conspiracy to commit armed robbery. Tyrin Barraza and Alec Billiot were each additionally charged with illegal possession of a firearm by a felon, and Alec Billiot was also charged with obstruction of justice. On December 19, 2022, the State nol prossed the attempted second degree murder counts against all defendants. Tyrin Barraza was severed from the case on January 5, 2022.

[2] Defendant was tried jointly with codefendants, Alec Billiot and Arec Billiot.

1

returned a verdict finding Defendant guilty of the responsive verdict of manslaughter and guilty as charged of conspiracy to commit armed robbery.[3]

A sentencing hearing was conducted on December 9, 2022. The district court sentenced Defendant on the manslaughter count to twenty-five years in the custody of the Department of Corrections at hard labor and on the conspiracy to commit armed robbery count to twenty-five years in the custody of the Department of Corrections at hard labor, without benefit of parole, probation, or suspension of sentence, and ordered the sentences to run concurrently with each other. Defendant timely instituted this appeal.[4]

## STATEMENT OF FACTS

Based on evidence, including surveillance footage, forensic evidence, witness testimony, and Defendant's own statements, the jury concluded that Defendant was an active participant in the crime. The evidence elicited at trial is summarized as follows:

On the night of January 9, 2020, a group of friends gathered at Bruno's Tavern on Maple Street in New Orleans. Among them were Lee Long ("Victim") and his friends Aislinn, Samantha, Emily, Vivian, and Madeline. At the end of the evening, Victim, Aislinn, and Emily walked to Victim's truck, which was parked near the corner of Hillary and Burthe Streets. Victim returned to the bar briefly to purchase marijuana from Tyrin "Tank" Barraza, who was sitting at a table on the patio with Alec Billiot, Arec Billiot, and Defendant.

---

[3] Alec Billiot was found guilty of manslaughter, conspiracy to commit armed robbery, possession of a firearm by a convicted felon, and obstruction of justice. Arec Billiot was found guilty of negligent homicide and conspiracy to commit first degree robbery.

[4] Alec Billiot and Arec Billiot have also filed separate appeals. *See State v. Billiot*, 23-0780; *State v. Billiot*, 23-0529.

After returning to his vehicle, Victim weighed the marijuana and realized he had received less than the agreed amount. Frustrated, he went back to Bruno's Tavern to confront Tank and obtain the rest of the marijuana. Afterward, he returned to his truck with the remainder of his friends and prepared to leave.

As Victim and his friends settled into the vehicle, four males suddenly approached and surrounded the truck. One stood in front of the windshield, pointing a firearm at the occupants, while two others opened the driver's side door and began physically attacking Victim, attempting to pull him out of the vehicle. A fourth individual positioned himself on the passenger side, blocking any escape.

The confrontation escalated when one of the assailants shouted at Victim to "open your pockets or I'll blow this b----." Victim attempted to resist, yelling for Aislinn to grab his firearm, which was kept near the steering wheel. Before she could retrieve it, multiple gunshots were fired. Victim suffered six gunshot wounds, two of which penetrated his lungs and heart, proving fatal. The assailants immediately fled the scene on foot.

Real-time crime camera footage, along with surveillance from a nearby restaurant, Kindred, and a residence on Hillary Street, played a critical role in identifying the suspects. The footage showed Alec, Arec, Tank, and Defendant leaving Bruno's Tavern together and following Victim and his friends to the truck. Shortly after the attack, the same four individuals were seen running from the scene.

Aislinn testified that she initially believed the men approaching the truck were joking, until she saw a gun aimed at the windshield. She heard demands for Victim to open his pockets and saw the attackers physically struggling with him

before gunshots rang out.[5] She described the individual pointing the firearm as wearing a black hoodie with white print.

Vivian testified that just before the attack, she saw Victim speak with a group of males on the patio of Bruno's Tavern, one of whom engaged in what appeared to be a marijuana exchange, and that shortly after, the truck was surrounded, Victim's door was ripped open, and a gun was pointed at the vehicle before shots were fired.[6]

Samantha described two attackers at the driver's side, one wearing a black hoodie and another wearing a black and white Champion-patterned shirt. This matched the clothing worn by Alec, as seen earlier in the night at the bar. She testified that two individuals, one in a black hoodie with a white logo and the other in a black and white Champion shirt, tried to pull Victim from the vehicle, and both were armed. She recalled seeing one of the attackers, whom she recognized from the bar, pointing a gun at the windshield. Samantha later identified Alec Billiot in a photographic lineup and wrote on the photograph that he was wearing

---

[5] Aislinn further testified that on the night of the incident, she and several friends met with Victim at Bruno's Tavern. After Victim briefly returned to the bar to confront an individual named Alec about a short marijuana transaction, he came back to the truck accompanied by Aislinn's other friends. Moments later, several men dressed in black clothing surrounded the truck. Aislinn attempted to retrieve Victim's firearm from near the steering wheel but was unable to remove it from the holster before the shooting began. She later participated in an informal investigation with friends and Victim's mother, identified Alec Billiot as a person of interest, and provided his photo and associations to police. She also recognized her own voice and the sound of the confrontation in residential surveillance audio that was played for the jury. On cross-examination, she acknowledged consuming two cocktails that night and told officers that the perpetrators appeared to be tall, white, and brunette.

[6] Vivian further testified that she arrived at Bruno's Tavern on January 9, 2020, with friends Peyton and Madeline, where they joined others on the patio. Later that night, Victim informed her the group was preparing to leave. As they walked out, Victim stopped to talk with a group of males, during which Vivian observed what looked like a marijuana transaction. She recognized only one person in the group, a guy named Ross, and did not know the others. Vivian then walked with Victim, Samantha, and Madeline to Victim's truck. Once inside, she saw someone raise a gun in the windshield and ducked down before hearing three gunshots. Although she described the gunman as a white male with brunette hair, she could not recall his clothing and was unable to identify any of the assailants. She later shared with police additional information she learned through her own investigation.

the black and white shirt and had the gun. Samantha described the attackers'

clothing in detail, stating that the Champion logos were "like all over" the shirt and

that she had seen it earlier at the bar.[7]

Emily similarly recalled seeing at least two armed men, one of whom moved

from the windshield to Victim's door just before shots were fired.[8] Madeline

testified that she recognized one of the attackers' hoodie from earlier at Bruno's

Tavern and later identified Alec as the shooter in a photographic lineup.[9]

---

[7] Samantha further testified that she traveled to Bruno's Tavern with friends on the evening of January 9, 2020, and later returned to Victim's truck after feeling unwell. As she and others waited inside the vehicle, several individuals approached and began pulling Victim from the truck. Samantha initially thought it was a prank until she heard screaming and Victim yelling, "Get the gun, get the gun!" On cross-examination, she stated she saw Alec fighting with Victim and confirmed he had a gun, although she believed someone else fired the fatal shots. She also testified that Victim appeared to sense a threat and hurried to escort her and others to the truck.

[8] Emily further testified that she had been at Bruno's Tavern and later T.J. Quills on January 9, 2020, drinking with her friends and Victim. After walking to Victim's truck with Aislinn, Victim left to retrieve their remaining friends. Once everyone was inside the vehicle, several individuals suddenly approached. Emily testified that as Victim was closing his door, someone began yelling and wrestling with it, shouting, "Get out, get out!" Victim fought back, and Emily observed at least two people outside his door, with a third person at the rear passenger door. One assailant, wearing a patterned black and white shirt, stood in front of the vehicle pointing a gun at the windshield before moving to the driver's side, where another person dressed in all black then took his place. Emily heard Victim scream to Aislinn to retrieve the gun, but he was shot several times before she could reach it. She could not recognize any of the assailants but tried to track the movement of the person with the gun. She explained that her recollection of the incident was sharper at trial than in her initial police statement, where she had said she could not see what the perpetrators were wearing. She also estimated the height of the gunman in front of the truck to be around six foot two, with the replacement being shorter. On redirect, she stated that the firearm she saw was black.

[9] Madeline further testified that she arrived at Bruno's Tavern around 11:00 p.m. on January 9, 2020, and sat on the patio drinking with friends. Later that evening, after Samantha began feeling sick, and the group decided to leave. Madeline walked to Victim's truck with Vivian and Samantha, while Emily and Aislinn were already in the truck. Once all were seated, the truck was suddenly surrounded, and Victim's door swung open as someone began attacking him. Madeline testified that she saw multiple individuals outside the truck: two in front of the windshield, one of whom was pointing a gun; one fighting with Victim at his door; another at the back driver's side door; and another behind him. She specifically remembered the shooter wearing a distinctive black and white patterned hoodie that she had seen earlier on the patio at Bruno's Tavern, worn by someone seated among a group of unfamiliar men with whom her friends Ross and Jack interacted. Following the incident, Madeline conducted her own informal investigation, matched the hoodie to Alec Billiot, and identified him as the shooter in a photographic lineup. On cross-examination, she confirmed Alec was the only person she could identify.

At trial, the prosecution introduced surveillance footage that captured Defendant walking alongside Alec, Arec, and Tank as they exited Bruno's Tavern and followed Victim and his friends toward his parked truck. The footage further showed these same individuals fleeing the scene immediately after the gunshots were fired.

During police questioning, Defendant admitted that he had been at Bruno's Tavern that night and was with the other co-defendants. However, he denied being anywhere near the crime scene at the time of the shooting. Defendant identified himself, Alec and Arec in still photos taken from surveillance footage that depicted a group of males following Victim to his vehicle shortly before the shooting. The footage further showed these same individuals fleeing the scene immediately after the gunshots were fired. The surveillance footage of Defendant fleeing the scene with Alec, Arec, and Tank, was presented at trial. The prosecution argued that this coordinated flight supported an inference that Defendant was not a bystander, but an active participant in the planned robbery and subsequent homicide.

At trial, the prosecution introduced physical and forensic evidence that linked the defendants to the crime. Investigators recovered four spent shell casings from the scene, all determined to have been fired from the same firearm. Despite searches, the murder weapon was never recovered. Additionally, a Kool brand cigarette butt was found near the victim's body. Forensic analysis confirmed that the DNA on the cigarette butt belonged to Alec, placing him at the crime scene just before the attack.[10]

---

[10] Justin Manuel, a forensic DNA analyst with the Louisiana State Police Crime Lab, was qualified at trial as an expert in forensic DNA analysis. He testified that he analyzed a Kool cigarette butt, a Luger nine-millimeter cartridge casing, and several swabs from the victim's vehicle, comparing the results to reference DNA samples from the victim and Alec. Justin

The forensic pathologist testified that Victim suffered multiple gunshot wounds, with two bullets penetrating his lungs and heart. The nature and location of the wounds were consistent with an intentional use of deadly force.[11]

Defendant initially claimed he left the bar alone, but video evidence contradicted his statement, showing him walking with the other assailants toward Victim's truck. A witness, Jack, who was a regular at Bruno's Tavern, testified that he saw Defendant sitting with Alec, Arec, and Tank on the bar patio before the attack. He further testified on cross-examination that he told police he observed Alec, Defendant, and Tank walking down the street shortly after the shooting.[12]

Another witness, Andrew, testified that he saw Victim purchase marijuana from Tank on the patio at Bruno's Tavern and noticed Tank sitting with three other

---

Manuel stated that the DNA profile from the cigarette butt matched Alec with a statistical likelihood of one in 3.64 nonillion for the Caucasian population. He further explained that no usable DNA was recovered from the cartridge casing or the swabs from the vehicle's door handles, noting that it is rare to retrieve DNA from shell casings. On cross-examination, he acknowledged he could not determine how long the cigarette butt or other items had been in the locations where they were found. His analysis was based on samples collected and prepared by John Mai, a DNA technician with the same lab, who testified that he examined the evidence for biological substances and submitted the Kool cigarette butt for analysis. Mai also identified the two scientific reports generated in the case.

[11] Dr. Aireal Sullivan, a forensic pathologist for the Orleans Parish Coroner's Office, qualified by the court as an expert in forensic pathology, testified that she performed the autopsy on the victim in the instant case and authored the associated toxicology report. Dr. Sullivan stated that the victim suffered a total of six gunshot wounds: two to his chest, which perforated his lungs and heart, and likely caused his death, and the rest to his left arm and left leg. She also testified that the victim's blood alcohol content was .052, and that the toxicology report reflected the presence of caffeine, hydrocodone, and THC.

[12] Jack further testified that he had known Victim since eighth grade and was familiar with Aislinn and her friends. As a regular at Bruno's Tavern, Jack stated he knew Alec and Arec and had seen Defendant and Tank at the bar, though he had never spoken with them. He recalled seeing all four men, Alec, Arec, Tank, and Defendant, sitting together at a patio table on the night of January 9, 2020, and noted that Alec was wearing a black hoodie with a Champion logo. Later that night, after assisting a friend with a jumpstart near TJ Quills, Jack witnessed an altercation and heard multiple gunshots. Shortly afterward, he saw Alec, Arec, and Tank walking down the street looking visibly shaken. When asked if they were okay, Tank responded, "Why wouldn't we be?" and denied hearing any gunshots. On cross-examination, Jack clarified that while he originally told police he had seen Defendant walking with Alec and Tank after the shooting, he later realized it may have been Arec instead of Defendant, explaining that it was dark, and he had not previously met Defendant.

men, including one wearing a Champion hoodie. Later that night, Andrew heard yelling and gunshots nearby and then observed Tank walking alone down the street.[13]

At trial, the State presented testimony from both law enforcement officers who responded to the scene and the lead homicide investigator assigned to the case. Sgt. Djuana Adams of the Tulane University Police Department testified that she was patrolling near Maple and Adams Streets when she heard rapid gunfire and drove toward the sound. Upon arriving at Burthe Street, she was flagged down by several young women near a tan pickup truck who screamed that their friend had been shot. Sgt. Adams was informed by the group that the shooters were three to four young white males with brown hair who had followed them from Bruno's Tavern, and that one had been wearing a black and white hoodie and carrying a firearm. She confirmed that the victim had a faint pulse but was unresponsive, and that she observed other officers attempting to resuscitate him. Although she did not initially observe any weapons in the vehicle, she later acknowledged that crime scene photographs depicted a firearm on the front passenger seat.

NOPD Detective Jamaane Roy testified that he responded to the murder scene as the lead investigator. He recovered four nine-millimeter shell casings and two bullet fragments, all consistent with the same firearm, although no murder weapon was located. Roy also found a Kool brand cigarette butt and a cigar wrap near the victim's body, marijuana in the truck, and a loaded firearm. Surveillance

---

[13] Andrew, a longtime friend of both Victim and Jack, testified that he had never met Alec, Arec, or Defendant, though he was familiar with Tank. He recalled seeing Victim obtain marijuana from Tank, who was wearing a red sweatshirt and sitting at a table with three unidentified men, one of whom wore a Champion hoodie. Andrew noted that Victim complained about the perceived shortage dissatisfied with the amount of marijuana he received but chose not to confront Tank about the perceived shortage. While assisting a friend jumpstart his vehicle later that evening, Andrew heard shouting and gunfire nearby. Moments later, he observed Tank walking alone in his direction.

footage from nearby residences and businesses captured the victim and his friends being followed back to the truck by several individuals. In a recorded interview played for the jury, Defendant initially denied being near the scene but later identified himself, Alec, and Arec in surveillance stills. Det. Roy further testified that Alec was identified by witnesses in a photographic lineup, and that Defendant became a person of interest based on this evidence. Despite executing a search warrant at Defendant's residence, no physical evidence was recovered. Det. Roy confirmed that the group seen in the footage included individuals who were later seen fleeing the scene.

## ASSIGNMENTS OF ERROR

On appeal, Defendant raises the following assignments of error:

1. The evidence was insufficient to convict [Defendant] of manslaughter or conspiracy to commit armed robbery.

2. The trial court erred when it failed to consider the [La. C.Cr.P. art.] 894.1 factors in [Defendant's] sentence and sentenced him to an excessive sentence.

## ERRORS PATENT

A review of the record pursuant to La. C.Cr.P. art. 920 indicates no errors patent.

## DISCUSSION

### *Sufficiency of the Evidence*

Defendant contends that the evidence presented at trial was insufficient to support his convictions for manslaughter and conspiracy to commit armed robbery. He argues that the State failed to present any evidence identifying him as one of the perpetrators and that there was no proof he possessed the specific intent necessary to convict him as a principal to either offense. The State, however,

maintains that it introduced sufficient evidence to establish Defendant's participation in the felony murder of Victim under Louisiana law. The prosecution asserts that Defendant placed himself at Bruno's Tavern and at the crime scene with Alec, Arec, and Tank, as evidenced by his own admissions in police interviews and his identification in still images from surveillance footage, which depicted the perpetrators following Victim to his vehicle. Additionally, the State argues that surveillance footage and an audio recording of the crime demonstrated that the perpetrators, acting together, attacked Victim while brandishing at least one firearm, demanding he empty his pockets, thereby proving their specific intent to commit armed robbery as a group.

When reviewing the sufficiency of the evidence to support a conviction, we apply the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under *Jackson*, an appellate court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. *State v. Williams*, 18-0445, p. 11 (La. 2/27/19), 265 So.3d 902, 912. The reviewing court must consider the whole record, just as the rational trier of fact considers all of the evidence, while presuming that the trier of fact acted rationally. *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988); *State v. Dukes*, 19-0172, pp. 7-8 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 752.

"If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted." *State v. Landrieu*, 18-0964, p. 6 (La. App. 4 Cir. 6/12/19), 274 So.3d 661, 667 (quoting *State v. Egana*, 97-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228). It is not the function of an appellate court to

reassess the credibility of witnesses or reweigh the evidence. *State v. Scott*, 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508. Credibility determinations, as well as the weight given to the evidence, are soundly within the province of the factfinder. *Id.* "Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." *Id.* (citation omitted). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion. *State v. D.D.*, 18-0891, p. 31 n. 24 (La. App. 4 Cir. 12/27/19), 288 So.3d 808, 834 (citing *State v. Finch*, 31,888, p. 16 (La. App. 2 Cir. 5/5/99), 733 So.2d 716, 727-28).

When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The requirement of La. R.S. 15:438 does not establish a standard separate from the *Jackson* standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. *State v. Captville*, 448 So.2d 676, 678-79 (La. 1984).

To preserve the role of the fact-finder, *i.e.*, to accord the deference demanded by *Jackson*, the Louisiana Supreme Court has further subscribed to the general principle in cases involving circumstantial evidence that when the fact-finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Mack*, 13-1311, p. 9 (La.

11

5/7/14), 144 So.3d 983, 989 (internal quotations omitted) (quoting *Captville*, 448 So.2d at 680). "A reasonable alternative hypothesis is not one 'which could explain the events in an exculpatory fashion,' but one that 'is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.'" *Id.*

We find that State presented a cohesive narrative through surveillance footage, eyewitness testimony, forensic evidence, and Defendant's own admissions. Although no witness testified that Defendant fired the fatal shots, the circumstantial evidence established that he was present during the planning and execution of the attack, participated in surrounding the vehicle, and fled the scene immediately afterward with the other perpetrators. Under La. R.S. 15:438, when the State relies on circumstantial evidence, the evidence must exclude every reasonable hypothesis of innocence. This standard was satisfied. The jury was entitled to weigh the totality of the circumstances and draw reasonable inferences from the coordinated conduct of the group. Based on this record, the jury's conclusion that Defendant was an active participant in a planned armed robbery that resulted in Victim's death is supported by sufficient evidence as more fully set forth below.

### Manslaughter

Defendant was charged with second degree murder; the jury, however, returned a responsive verdict of manslaughter.[14] A reviewing court need not determine whether the evidence supports the responsive verdict returned by the jury where the defendant does not object to the inclusion of the responsive verdict and the evidence is sufficient to support a conviction of the greater offense

---

[14] Manslaughter is an authorized responsive verdict to a charge of second degree murder. *See* La. C.Cr.P. art. 814(A)(3).

charged. *State v. Alverez*, 13-1652, p. 6 (La. App. 4 Cir. 12/23/14), 158 So.3d 142, 148; *see also State ex rel. Elaire v. Blackburn,* 424 So.2d 246, 251(La. 1982). Defendant did not object to the inclusion of manslaughter as a responsive verdict. Therefore, in the absence of Defendant's objection to the responsive verdict, the jury's verdict of manslaughter is authorized provided the evidence adduced at trial was sufficient to support a conviction for the charged offense of second degree murder. *State v. Johnson*, 13-0343, pp. 6-7 (La. App. 4 Cir. 10/1/14), 151 So.3d 683, 689 (citing *State v. Harris,* 97-2903, p. 8 (La. App. 4 Cir. 9/1/99), 742 So.2d 997, 1001).

Under the theory of felony murder, second degree murder is defined as "the killing of a human being… [w]hen the offender is engaged in the perpetration or attempted perpetration of … armed robbery… even though he has no intent to kill or inflict great bodily harm." La. R.S. 14:30.1(A)(2). "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. R.S. 14:24. "In reviewing a defendant's conviction as a principal, a reviewing court looks to evidence of actions preceding a given offense, during the offense, and after the offense." *State v. Jackson*, 14-0954, p. 2 (La. App. 4 Cir. 3/11/15), 163 So.3d 98, 100 (citing *State v. Quac Tran*, 08-1103, p. 9 (La. App. 4 Cir. 8/13/09), 18 So.3d 165, 170).

In the case *sub judice,* the State introduced multiple forms of evidence demonstrating that Defendant knowingly participated in the crime. Surveillance footage from a restaurant near Bruno's Tavern, a real-time crime camera, and a residence near the crime scene showed four males following Victim and his friends

after they left Bruno's Tavern. The footage captured a voice demanding that Victim "open your pockets or I'll blow this b----", immediately followed by four gunshots. The video also showed the same four males fleeing the scene, with one separating from the others in a different direction.

Jack, a witness who knew the group, identified Alec and Arec in the surveillance footage. Additionally, Defendant admitted during a police interview that he was present at Bruno's Tavern with Alec, Arec, and Tank on the night of the crime. He further identified himself in still images from surveillance footage, which depicted the group following Victim to his truck.

Although Samantha and Madeline identified Alec as the shooter in a photographic lineup, Samantha clarified during trial that another individual actually fired the fatal shots. She described the person pointing a gun at the windshield as wearing a black and white Champion-patterned shirt, consistent with Alec's clothing. She further described the shooter as wearing a black hoodie with a white logo, which the jury could reasonably have found to be Defendant. Aislinn, who was also inside the vehicle, testified that the person aiming at the windshield wore a black hoodie with white print across the front, while Emily described a patterned black and white shirt, noting that this person later moved to the driver's side, where the shooting occurred.

The State also introduced forensic evidence linking the suspects to the crime. One of the individuals captured in the surveillance footage was smoking a cigarette as the group approached Victim's truck. A forensic analyst testified that DNA from a Kool brand cigarette butt found at the crime scene matched Alec. Given this forensic link, the jury could reasonably infer the identity of the individuals in the footage, corroborating witness descriptions of the attackers.

The prosecution presented further evidence that Victim was shot while armed assailants attempted to rob him. Under La. R.S. 14:64, armed robbery is defined as taking something of value from another person by use of force or intimidation while armed with a dangerous weapon. Testimony established that Victim had recently argued with Tank over receiving less than the agreed-upon amount of marijuana. Witnesses described Victim as leaving Bruno's Tavern quickly, appearing to sense an impending confrontation. The audio recording of the attack captured a perpetrator demanding that Victim empty his pockets, while trial testimony confirmed that at least one of the perpetrators was armed.

While no witness specifically identified Defendant, several eyewitnesses placed him among the group that approached and surrounded Victim's vehicle during the ambush. One witness, Jack, testified that he saw Defendant seated at a patio table earlier that night with Alec, Arec, and Tank. Although Jack later expressed some uncertainty during cross-examination as to whether it was Defendant or Arec whom he saw walking with Alec and Tank after the shooting, Defendant himself later admitted during a police interview that he was present at Bruno's Tavern with Alec and Arec and identified himself in surveillance stills. The jury could have reasonably resolved any ambiguity in witness testimony in light of Defendant's own admissions and the corroborating video evidence.

The jury could have reasonably concluded that Defendant and his co-defendants intended to rob Victim by intimidation or force, and that when Victim resisted, he was shot and killed. Given the overwhelming evidence of Defendant's coordinated actions, presence at the scene, flight after the shooting, and false statements to law enforcement, a rational trier of fact could find that the State proved all elements of felony murder beyond a reasonable doubt. Because the State

introduced sufficient evidence for a rational jury to convict Defendant of second degree murder, and because Defendant failed to object to manslaughter as a responsive verdict, the evidence was necessarily sufficient to sustain the conviction of manslaughter.

### *Conspiracy to commit armed robbery*

Defendant next asserts that the State presented insufficient evidence to sustain his conviction for conspiracy to commit armed robbery, arguing that the State failed to prove that he "entered into any kind of an agreement to commit a crime" or that he committed an overt act in furtherance thereof.

"Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination." La. R.S. 14:26(A). Armed robbery is defined as "the taking anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. "Proof of conspiracy may be by direct or circumstantial evidence." *State v. Hickerson*, 19-1077, p. 16 (La. App. 4 Cir. 12/30/20), 312 So.3d 1124, 1136 (citing *State v. Johnson*, 438 So.2d 1091, 1099 (La. 1983)).

An element of the crime of conspiracy is specific intent, *State v. Toby*, 23-00722, p. 3 (La. 10/25/24), 395 So.3d 831, 834, which is defined as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

La. R.S. 14:10(1). Specific criminal intent may be inferred from the circumstances and actions of the defendant. *State v. Harrison*, 08-1110, p. 15 (La. App. 4 Cir. 6/25/09), 16 So.3d 447, 457. "The clear purpose of [La. R.S.] 14:26 is to criminalize the conduct of two or more persons who intend a criminal act and as a result of that intention—manifested as an agreement or combination—one of these does something in furtherance of the intended criminal act." *State v. Daniels*, 607 So.2d 620, 623 (La. App. 2d Cir. 1992)(quotations, internal citation, and emphasis omitted). While the statute requires proof of either an agreement or combination of two or more persons, "[t]he word 'combination' does not obviate the necessity for at least two parties to possess malefic intent for a conspiracy to exist. We thus determine that the pertinent statute requires criminal intent in the mind of at least two persons, and, of course, an overt act in furtherance of the enterprise, for a conspiracy to exist." *State v. Joles*, 485 So.2d 212, 214 (La. App. 2d Cir. 1986). Additionally, the "failure to interfere with or question the actions of companions who are committing a crime may be considered evidence of intent on the part of the passive defendant." *State v. Spotville*, 583 So.2d 602, 606-07 (La. App. 4th Cir. 1991) (Plotkin, J., concurring) (citing *State v. Bates*, 495 So.2d 1262, 1269 (La. 1986)).

Defendant in the case *sub judice* complains specifically that the State failed to prove that he entered into an agreement to commit armed robbery. However, Louisiana courts have held that circumstantial evidence that the perpetrators intended to commit the underlying offense together is sufficient to show that they were in agreement. *See Toby*, 23-00722, p. 5, 395 So.3d at 835 ("Simply because there was no direct evidence, such as the precise content of a text message to show an agreement (defendant replaced his phone, thus covered his tracks), jurors were

17

not foreclosed from inferring from the circumstantial evidence presented that defendant conspired with his brother in the plot to kill Broussard."); *State v. Stewart*, 452 So.2d 186, 193 (La. App. 4th Cir. 1984) (The jury could infer the existence of a conspiracy "[n]otwithstanding [defendant's] denial that he contacted Anderson, or Anderson's denial that he was contacted by [defendant], the jury was entitled to believe, based on the phone call and appearance of Anderson shortly thereafter, that contact between them took place and that as a result of this contact Anderson appeared at [defendant's] home to arrange the drug sale."); *State v. Johnson*, 01-1084, p. 7 (La. App. 3 Cir. 2/6/02), 817 So.2d 120, 125 ("Whether the agreement to murder the victim was actually discussed or tacit, when the Defendant left Ms. Johnson in the house alone with the victim to go and dig the victim's grave, and she did not untie the victim or call for help, there was sufficient evidence for the jury to reasonably infer that the Defendant and Ms. Johnson entered into an agreement to kill the victim."); *State v. Hampton*, 38,017-KA to 38,022-KA, pp. 9-10 (La. App. 2 Cir. 1/28/04), 865 So.2d 284, 291-92 (The jury could have reasonably found sufficient evidence of a conspiracy "when the driver of the SUV, acting either on a predetermined plan or at [the defendant's] direction, stopped the vehicle at Mr. Lowe's driveway. This act shows that the driver of the vehicle [] was acting in concert with [the defendant]," in committing the robbery).

In *State v. Gutter*, 393 So.2d 700, 702 (La. 1981), the defendant pulled his vehicle into a gas station behind the victims' vehicle, and his two passengers exited and proceeded to rob the victims at gunpoint. During the robberies, the victims noticed the defendant standing "approximately one foot from the rear of [the victim's] car" where he was "able to observe the robberies, yet he made no attempt to interfere with or otherwise question the acts of his companions;" the defendant

then drove away with the perpetrators after they divided the stolen property between them following the offense. *Id.* The Supreme Court found that the evidence presented supported the inference that the defendant acted as a "lookout" while his companions robbed the victims at gunpoint and was sufficient to show that the defendant "either combined or agreed to commit the criminal act." *Id.* Although the defendant was on trial for armed robbery, the Court held that the evidence was sufficient to establish a prima facie case of conspiracy. *Id.*

Although there is no direct evidence of a verbal agreement between Defendant and his co-perpetrators, the circumstantial evidence overwhelmingly supports the existence of a conspiracy. Surveillance footage shows Defendant, Alec, Arec, and Tank leaving Bruno's Tavern together and following Victim and his friends to the vehicle. The four assailants strategically surrounded the truck, blocking all exits before demanding that Victim empty his pockets while brandishing at least one firearm. Immediately after the gunshots, all four individuals fled the scene together, further supporting an inference of shared intent.

Moreover, none of the four individuals attempted to stop the attack, remove themselves from the scene, or report the crime. Their collective failure to intervene strengthens the inference of coordinated intent, as Louisiana courts have found that a passive defendant's failure to object or intervene may be considered evidence of intent. *See State v. Fernandez*, 09-1727, p. 10 (La. App. 4 Cir. 10/6/10), 50 So.3d 219, 226-27. Additionally, Defendant's initial false statement to police claiming he left Bruno's Tavern alone, contradicted by surveillance footage showing him walking with the other perpetrators toward the crime scene, is further indicative of guilt. *See State v. Aspara*, 113 La. 940, 37 So. 883 (1904) (holding that false exculpatory statements may be considered as evidence of guilt).

Based on the totality of the evidence, a rational jury could conclude that Defendant and his co-perpetrators conspired to commit armed robbery. Their coordinated movements, synchronized attack, demand for Victim to empty his pockets, and immediate flight from the scene provide sufficient circumstantial evidence of an agreement. Because the State presented sufficient evidence to establish both an agreement and an overt act in furtherance of that agreement, Defendant's conviction for conspiracy to commit armed robbery was supported by the evidence.

### Excessive Sentences

Defendant asserts that the district court erred in imposing excessive sentences on both of his convictions and in failing to consider the sentencing criteria set forth in La. C.Cr.P. art. 894.1. The State argues that because Defendant did not file a motion to reconsider sentence in the district court, he is precluded from raising his objection to the sentences on appeal.

La. C.Cr.P. art. 881.1 provides, in pertinent part, as follows:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . .
>
> B. The motion shall be oral at the time of sentence or shall be in writing thereafter and shall set forth the specific grounds on which the motion is based.
>
> . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

"[A] simple objection to the sentence is sufficient to preserve appellate review on the grounds of excessiveness." *State v. Mitchell*, 21-0488, p. 4 (La. App. 4 Cir. 12/15/21), 334 So.3d 449, 452 (quoting *State v. Kirkling*, 04-1906, p. 6 (La. App. 4 Cir. 5/18/05), 904 So.2d 786, 790). However, "[w]here a defendant merely objects to the excessiveness of the sentence without stating the specific grounds for his objection, he is limited to a bare review of the sentence for constitutional excessiveness." *State v. Barnes*, 01-489, p. 3 (La. App. 5 Cir. 10/17/01), 800 So.2d 973, 976 (citing *State v. Hester*, 99-426, p. 10 (La. App. 5 Cir. 9/28/99), 746 So.2d 95, 103).

In the case *sub judice*, defense counsel failed to file a motion to reconsider sentence and merely stated, "Note our objection." As a result, Defendant's appellate review is limited to constitutional excessiveness, meaning that the court may only determine whether the sentence violates the constitutional prohibition against excessive punishment. *See Barnes*, 01-489, p. 3, 800 So.2d at 976.

Defendant was sentenced to twenty-five years for manslaughter and twenty-five years for conspiracy to commit armed robbery, without the benefit of parole, probation, or suspension of sentence and with both sentences running concurrently. Under Louisiana law, manslaughter carries a maximum penalty of forty years at hard labor, *see* La. R.S. 14:31(B), and conspiracy to commit armed robbery carries a sentencing range of ten to forty-nine and a half years, without benefits. *See* La. R.S. 14:64 and La. R.S. 14:26. Even when a sentence falls within the statutory range, it may still be considered excessive if it "shocks the sense of justice" or is grossly disproportionate to the severity of the offense. *See State v. Bertrand*, 04-1496, p. 6 (La. App. 4 Cir. 12/15/04), 891 So.2d 752, 757.

21

A trial court has broad discretion in sentencing, and an appellate court may only overturn a sentence if there is a manifest abuse of discretion. *See State v. Cann*, 471 So.2d 701, 703 (La. 1985). The relevant inquiry is not whether a different sentence might have been more appropriate, but whether the imposed sentence is excessive under the circumstances. *See State v. Walker*, 00-3200, p. 2 (La. 10/12/01), 799 So.2d 461, 462.

The evidence presented at trial could have supported a conviction for second degree murder, which carries a mandatory life sentence under La. R.S. 14:30.1. Louisiana courts recognize that a trial court may consider the nature of the offense and whether the lesser conviction adequately reflects the defendant's culpability. *See State v. Lewis*, 09-1404, p. 8 (La. 10/22/10), 48 So.3d 1073, 1078. In the case *sub judice*, Defendant benefitted substantially from the jury's decision to return a lesser responsive verdict of manslaughter, thereby avoiding a mandatory life sentence.

Additionally, the circumstances of the crime justify the imposed sentence. The evidence showed that Defendant and his accomplices followed Victim from Bruno's Tavern to his parked car in an attempt to remain undetected, ambushed him, and ultimately shot and killed him over a small quantity of marijuana. This deliberate and violent attack, coupled with the fact that Defendant played an active role in the offense, supports the district court's decision to impose a significant, but not maximum, sentence.

Considering the nature of the crime, the substantial benefit Defendant received from the jury's verdict, and the fact that his sentences fall well below the statutory maximums, the district court did not abuse its discretion in sentencing

Defendant. Therefore, Defendant's claim that his sentences are excessive is without merit.

## DECREE

For the foregoing reasons, we affirm Defendant's convictions and sentences.

**AFFIRMED**