STATE OF LOUISIANA     *     NO. 2023-KA-0529

VERSUS     *     COURT OF APPEAL

AREC J. BILLIOT     *     FOURTH CIRCUIT

    *     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 549-711, SECTION "DIVISION L"
Judge Angel Harris,
* * * * * *
**Judge Rachael D. Johnson**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)

**LEDET, J. CONCURS**

JASON ROGERS
DISTRICT ATTORNEY
BRAD SCOTT
ZACHARY PHILLIPS
ORLEANS PARISH DISTRICT ATTORNEY
619 SOUTH WHITE STREET
NEW ORLEANS, LA 70119

       COUNSEL FOR STATE/APPELLEE


Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
1538 Short Street
New Orleans, LA 70118


       COUNSEL FOR DEFENDANT/APPELLANT

                  **AFFIRMED IN PART;**
                  **VACATED IN PART**
                  **AND REMANDED**
                  **May 16, 2025**

Defendant Arec Billiot, seeks review of his convictions and sentences for the responsive verdicts of negligent homicide and conspiracy to commit first-degree robbery, respectively. Pursuant to our review of the record and the applicable law, we affirm Defendant's convictions; however, we vacate Defendant's sentences and remand this matter for resentencing.

**Procedural History**

This appeal involves Defendant's convictions and sentences for his alleged participation in the attempted armed robbery and murder of Lee Long, Jr. ("Lee"). On August 20, 2020, an Orleans Parish Grand Jury indicted Defendant and co-defendants Alec Billiot,[1] Caiden Fruge, and Tyrin Barrazza ("Tank") on 31 counts. The Grand Jury indicted Defendant on seven of those counts: one count of second-degree murder with a firearm, a felony in violation of La. Rev. Stat. 14: 30.1; one count of conspiracy to commit armed robbery, a violation of La. Rev. Stat. 14:(26)64.3; and, five counts of attempted second-degree murder, a violation of La. Rev. Stat. 14:(27)30.1.

---

[1] Defendant and Alec are brothers.

1

In September 2020, the State filed an indictment charging Defendant with one count of second-degree murder, one count of conspiracy to commit armed robbery, and five counts of attempted second-degree murder. Defendant pled not guilty to all counts at his arraignment. Tank filed a motion to sever from the other three co-Defendants, which the district court granted. Defendant and Caiden later filed a joint motion to sever, which was denied. The State later entered a *nolle prosequi* for Defendant's five counts of attempted second-degree murder with a firearm upon a known victim, a violation of La. Rev. Stat. 14:(27)30.1.

The joint trial of Defendant, Alec, and Caiden began on October 18, 2022. Following a seven-day jury trial in October 2022, the jury reached unanimous verdicts as to all three defendants, with Defendant being found guilty on Count 2 of the lesser offense of negligent homicide, a violation of La. Rev. State. 14:32, and guilty on Count 29, of the offense of conspiracy to commit first degree robbery, a violation of La. Rev. Stat. 14:(26)64.1.[2]

Following the issuance of a pre-sentence investigation report, Defendant moved for post-verdict judgment of acquittal on December 6, 2022, which the district court denied at a December 9, 2022 hearing. Later that same day, the district court held a sentencing hearing, where Defendant was sentenced to five years imprisonment at hard labor for negligent homicide, and 20 years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for conspiracy to commit first degree robbery. His sentences were

---

[2] Caiden appealed his convictions of manslaughter and conspiracy to commit armed robbery and his respective sentences. *See State v. Fruge*, 23-0552 (La. App. 4 Cir. 4/11/25), 2025 WL 1088089. Alec, who was found guilty of manslaughter, conspiracy to commit armed robbery, possession of a firearm by a convicted felon, and obstruction of justice, appealed his convictions and sentences therefor in 2023-KA-0780.

ordered to run concurrently. Following sentencing, Defendant timely filed the instant appeal.[3]

**Statement of Facts and Relevant Trial Testimony**

The facts of this matter are gleaned from the testimony of 12 witnesses, who testified at trial on behalf of the State: 1.) New Orleans Police Department ("NOPD") homicide Detective Jaamane Roy, who served as the lead detective on this case; 2.) Sergeant Djuana Adams of the Tulane University Police Department, who was the first law enforcement officer to respond to the scene; 3.) Dr. Aireal Sullivan, an Orleans Parish Coroner's office forensic pathologist who was qualified by the district court as an expert in forensic pathology and testified to performing of Lee's autopsy and authored the forensic report; 4.) John Mai, a Louisiana State Police Crime Lab DNA technician, who examined evidence in this case for the presence of biological substances; 5.) Justin Manuel, Louisiana State Police Crime Lab forensic and DNA analyst, who was qualified by the district court as a forensic DNA analysis expert, who analyzed case samples taken from a Kool cigarette butt, a Luger nine-millimeter cartridge casing and the exterior front door driver's door handle of Lee's vehicle; 6.) Andrew Held, an acquaintance of

---

[3] Defendant later filed a motion to supplement the appellate record with various transcripts, including the portion of the December 9, 2022 transcript prior to sentencing, photographic identification exhibits, and court minutes, and to suspend the briefing schedule pending supplementation, which this Court granted on August 25, 2023. The record was later partially supplemented and the Clerk of this Court, on June 18, 2024, lifted the stay and issued a notice of completion of record. However, the missing portion of the December 9, 2022 transcript was not provided nor were State's Exhibits 11, *in globo,* and 13. Moreover, this Court further noted that the State's electronic exhibits were missing from the record. The Clerk of Criminal Court later supplemented the record with the missing electronic evidence as well as State's Exhibit 11, *in globo,* with the missing electronic evidence. Accordingly, on November 7, 2024, this Court ordered the supplementation of the record with the portion of the December 9, 2022 transcript prior to sentencing and State Exhibit 13. The district court later partially complied with the order, producing State Exhibit 13. Thus, on November 26, 2024, this Court ordered the court reporter to supplement the record with the missing portion of the December 9, 2022 transcript. The court reporter subsequently complied. This Court lifted the stay and deemed the matter submitted on January 17, 2025.

Lee; 7.) Jack Gordy, an acquaintance of Lee and Alec; 8-11.) Samantha Del Corral, Emily Whelan, Vivian Nguy and Madeline Cristenberry, who were Lee's friends and back-seat passengers in his car on the night of his murder; and 12.) Aislinn Finnegan-Wilson, Lee's girlfriend and front-seat passenger in his car the night of his murder. Defendant did not present any witnesses.

At trial, the State introduced the following evidence: the 911 call that Aislinn and her friends made during the attack; residential surveillance footage showing the intersection of Hillary and Burthe Streets at the time of the attack; Real Time Crime Center camera footage depicting the location of Bruno's and TJ Quills at the intersection of Maple and Hillary Streets around the time of the incident; an audio and video recorded interview of Caiden; and still photographs, or confirmation photographs, of the suspects taken from the crime scene which were shown to Jack during his interview with the NOPD. The following is a summary of the facts based upon the testimony of the foregoing witnesses and the State's evidence introduced at trial.

On the evening of January 9, 2020, twenty-year-old Lee and his girlfriend Aislinn went out drinking at various bars, namely Bruno's Tavern ("Bruno's"), near Tulane University's campus in New Orleans, with a group of friends, Samantha, Madeline, Vivian, and Emily. In the early morning hours of January 10, 2020, Lee, Aislinn and Emily returned to Lee's pickup truck, which was parked on the corner of Hillary and Burthe Streets.  Lee left Aislinn and Emily in his truck in search of marijuana.

Jack, Lee's acquaintance, informed Lee that Tank had marijuana.  Lee found Tank, who was seated with Defendant, Alec, and Caiden, at Bruno's. Lee bought what he believed to be one gram of marijuana from Tank. However, after walking

4

to his truck and weighing the marijuana, he discovered Tank shorted him by 0.3 grams. He left Aislinn and Emily in his truck again and returned to Bruno's to retrieve the missing quantity of marijuana from Tank, who was still sitting with Defendant, Alec, and Caiden.

After engaging in a brief conversation, Tank gave Lee the missing quantity of marijuana. Lee hurriedly gathered Samantha, Madeline and Vivian to walk back to his truck with the missing marijuana, to join Aislinn and Emily.

Four men followed Lee, Samantha, Madeline and Vivian to Lee's truck, eventually surrounding the vehicle. Lee was seated in the driver's seat, Aislinn in the passenger seat, with Emily, Samantha, Madeline and Vivian seated in the backseat. Two of the men stood in front of Lee's truck while one man stood by Lee's driver's side door and a fourth man stood near the passenger door on the driver's side. One of the men standing in front of the truck was armed with a firearm that was pointed at the windshield of Lee's truck, and another armed man was positioned at Lee's door. One of the men opened Lee's door, demanding that he empty his pockets. The man argued and fought with Lee. At some point during the altercation, Lee directed Aislinn to hand him a gun that was affixed to the center console. Before Aislinn could hand him the weapon, Lee was shot multiple times, including in his chest, by one of the assailants.[4] The four perpetrators fled the scene, and Lee succumbed to his wounds shortly thereafter.

Lee's girlfriend, Aislinn, recounted that she observed Lee fighting with the perpetrators and tried to retrieve Lee's firearm from its position near the steering wheel; however, she was unable to remove it from its holster. Following Lee's

_____

[4] Dr. Sullivan testified that Lee suffered six gunshot wounds including two to his chest, which likely caused his death, and the rest to his left arm and left leg.

murder, she conducted her own investigation— assisted by her friends and Lee's mother—which resulted in her developing Alec's name as a possible person of interest in Lee's murder. She discovered Alec's picture, but could not "independently identify" him as one of the perpetrators. Nevertheless, after figuring out who Alec's friends were and who he was out with on the night of Lee's murder, she provided that information to the NOPD.

At trial, after watching residential surveillance footage of the intersection of Hillary and Burthe Streets, Aislinn identified her voice in the footage screaming and noted that she heard a male voice shouting "open your pockets 'n-word' " that was not Lee's voice. She further observed three persons dressed in black approaching Lee's truck that night, but did not see any of their faces. However, she did recall seeing the person standing in front of the truck pointing a firearm at the windshield of Lee's car, who wore a black hoodie with "white print going across everything." She described the perpetrators to police as "tall, white, and brunette," but clarified that her recollection of the perpetrators' appearances was unclear and distorted as this intense event occurred quickly, and she was focused on Lee's safety.

Emily testified that on the night of the murder she saw the perpetrators surround the car and witnessed a person pointing a black firearm at Lee's windshield.

Vivian testified that on the night of Lee's murder she walked with Lee towards the Bruno's exit, but Lee then turned towards the patio where she observed him speaking with a group of guys and holding his hand out. She believed the exchange pertained to weed, as she thought Lee had weed in his

outstretched hand. She testified that the only person she could identify in the group Lee spoke with was Ross Gonzales.

Vivian then returned to Lee's truck with Samantha, Madeline, and Lee, where Aislinn and Emily were waiting. Vivian testified that once everyone was seated in Lee's truck, Lee's driver's side door was "ripped open" and the perpetrators were pulling Lee out of the truck. She saw a "brunette, white male" armed perpetrator raising a gun at the windshield pointed at everyone in truck, but could not recall his clothing. After crouching down behind Lee's seat, she closed her eyes and heard three gun shots. Vivian testified that she could not identify the perpetrators.

Samantha testified that before leaving the bar that night, Lee hurriedly escorted her and her friends to his truck as if "he knew something was about to go down." She recalled what two of the perpetrators who attacked Lee at his car door were wearing: one assailant wore a "black and white 'Champion' T-shirt" covered with Champion logos; and the second assailant wore a black and white hoodie with the hood on. She could see one perpetrator through Lee's windshield "because the lights were on." This perpetrator later relocated to Lee's door as she recalled there were two people standing there when he was shot.

Samantha further testified that it was Alec she witnessed fighting with Lee and pulling him out of the vehicle with the assistance of another perpetrator who wore a hoodie. She explained that although she saw Alec with a gun, she saw another perpetrator shoot Lee. Alec was the only perpetrator whose face she could identify. She also testified that she saw Defendant with the "same group of guys" as Alec inside Bruno's earlier that night. Following Lee's murder, Samantha noticed that Alec was following her Instagram account and his profile picture

appeared to depict one of the assailants. She later identified Alec in an NOPD photographic lineup, writing on his photograph "Boy who shot Lee at door with black and white shirt/hoodie."

Madeline testified that while she was with Samantha, Vivian and Lee approached informing them that the group was ready to leave. The four walked to Lee's vehicle, where Emily and Aislinn were waiting. After everyone was seated in the vehicle, Lee's door swung open and she witnessed someone attacking Lee. The truck was surrounded by several people, all of whom appeared to be white males. She could see two people through the windshield, one of whom was pointing a gun at them. Another perpetrator fought with Lee at his car door, while another assailant stood behind that perpetrator at the rear door on the driver's side of the vehicle. She testified that when she tried to exit the vehicle, the perpetrators shut her door to prevent her from leaving.

Madeline recalled that the assailant who fought and shot Lee wore a hoodie with a distinctive black and white pattern, which was the same that she remembered seeing someone wearing earlier that night seated on the patio at Bruno's. She recalled that her friends Ross and Jack interacted with the group of men seated on the patio with the man wearing the hoodie earlier that evening. After the shooting, the perpetrators fled towards Bruno's.

Madeline also testified that after conducting her own independent research into the identities of the perpetrators, she discovered Alec's name and that his face matched that of the person who wore the sweatshirt on the night of Lee's murder. She informed the police that aside from the assailant wearing a patterned hoodie, the other assailants wore dark clothing. She identified Alec as the shooter in an NOPD photographic lineup. Alec was the only assailant she could identify.

8

Det. Roy, serving as the lead detective in this matter, testified that he arrived at the scene on January 10, 2020.[5] While at the scene, Det. Roy, discovered the following items: three Hornady nine-millimeter casings on the ground as well as an additional Hornady nine-millimeter casing near Lee's arm with two bullet fragments under Lee's body; a Kool brand cigarette butt near Lee's body; and a Goodies cigar wrap. Inside of Lee's truck, the NOPD retrieved a loaded firearm as well as marijuana.[6] He further testified that NOPD detectives located residential surveillance footage from a home near the crime scene and the surveillance footage of Kindred Restaurant and Redd's Tavern.

During his investigation, Det. Roy interviewed Aislinn, Samantha, Vivian, and Madeline, as well as two patrons of Bruno's on the night of the murder, Jack and Andrew. Det. Roy's investigation led him to develop Alec as a suspect and arrange a "six-pack" photographic lineup.[7] A NOPD officer, who was unaffiliated with the investigation, conducted the "six-pack" photographic lineup with Samantha and Madeline, who identified Alec as one of the perpetrators.

Jack, an acquaintance of Lee as well as of Defendant, Alec and Tank, testified that he saw Defendant, Alec, Tank and Caiden, who was unknown to him,

---

[5] The first law enforcement officer to respond to the scene was retired Sgt. Adams with the Tulane University Police Department, who was patrolling the area near the crime scene on January 9, 2020, when she heard rapid-fire gunshots. Sgt. Adams testified that she radioed in to the dispatcher to request assistance and to notify the NOPD. While attempting to follow the sound of the gunshots, she turned onto Burthe St. where a group of young women flagged her down and informed her that their friend had been shot. She testified at trial that the group of women informed her that the assailants were three to four young white males. Her involvement ended when NOPD homicide detectives arrived on the scene.

[6] Mr. Mai, a DNA technician, explained that he collected and prepared the evidence samples—including a sample from "a partially burnt Kool cigarette butt"— for further analysis, results, and conclusions by DNA analyst Justin Manuel.

[7] Det. Roy testified that a single "confirmation" photograph is shown to a witness who "actually knows the person that they're talking about," whereas a "blind" six-pack photographic lineup is used to identify an unknown suspect.

seated together on Bruno's patio the night of Lee's murder. Jack stated that he and Alec spoke that evening when they exchanged compliments on each other's clothing. Jack complimented Alec on his "black hoodie with a Champion logo on the front of it."

Jack recounted that Lee became upset with Tank that evening, believing Tank gave him less than the gram of marijuana he purchased. Jack testified that he and Lee parted ways at Bruno's, with each of them walking in a different direction from the bar. Jack was assisting with jumpstarting a friend's car nearby when he witnessed a group of people arguing near where his vehicle was parked. A few minutes later, he heard multiple gunshots ring out near the location of the altercation. Jack decided to move his vehicle, but as he drove back to TJ Quills, he witnessed Defendant and Alec looking "awfully shook up," and crossing the street with Tank and walking "in the opposite direction of the scene." When Jack inquired whether the group was alright and had heard the gunshots, Tank replied, "Why wouldn't we be?" and, "What gunshots?", respectively. After watching surveillance footage showing Lee being followed to his vehicle, Jack identified Alec and Tank, but could not recognize if the third person with the pair was Defendant or Caiden. He testified that he provided a statement to NOPD wherein he identified Defendant and Alec in a photographic identification procedure. He also assisted Aislinn and her friends with their investigation.

During his interview of Jack, Det. Roy showed him still photographs of the suspects sourced from surveillance footage. Jack identified Defendant, Tank and Alec.

Andrew testified that he was at Bruno's the night of Lee's murder and that he was an acquaintance of Lee and Jack, but not Defendant and his cohorts.

10

During the course of the night, he witnessed Lee purchase marijuana from Tank on the patio at Bruno's. Andrew testified that Lee was upset about receiving less than the "full gram of weed" he had purchased, but Lee "left it alone." He described Tank as wearing a red sweatshirt, and was sitting at a table with other guys, including one male who wore a "Champion Hoodie." Later that night, as Andrew assisted a friend with jumpstarting a vehicle nearby, Andrew heard "screaming and yelling down the street," followed by several gunshots. Soon thereafter, Andrew saw Tank walking down the street alone in his direction.

Det. Roy ultimately developed three persons of interest who he believed may have been with Alec on the night of Lee's murder: Tank, Defendant and Caiden. Det. Roy testified that he interviewed Caiden and executed a search warrant of his residence, but nothing of evidentiary value was discovered. Caiden, however, placed himself, Defendant, Alec, and Tank at the scene of the crime, but denied being involved in Lee's murder.

Regarding the surveillance videos the NOPD acquired, Det. Roy reviewed residential, business and real-time camera footage. The real-time camera surveillance footage showed Lee walking to his truck with Aislinn and Emily, before he returned to Bruno's alone. Later the footage showed Lee walking to his truck with Aislinn's friends while being followed by a group of people. Additionally, real-time camera footage and surveillance footage from establishments in the immediate area of the crime scene showed Defendant, Alec, Caiden, and Tank walking towards Lee's truck at 1:50 a.m., around the time Lee was shot, and fleeing shortly afterwards. Lastly, business surveillance footage showed Lee and Aislinn's friends being followed by a group of people, including

11

one person who was smoking a cigarette, and that later the group of perpetrators were seen fleeing the scene.

Det. Roy obtained a warrant for Alec's arrest as well as search warrants for his residence and to collect a buccal swab of his DNA. Incident to a search of Alec's residence, the NOPD discovered a firearm inside a vehicle belonging to Alec's mother. Det. Roy explained that no clothing was retrieved from Alec's home that matched what witnesses had described.

Forensic and DNA analyst, Mr. Manuel, related that he analyzed case samples taken from a Kool cigarette butt, a Luger nine-millimeter cartridge casing, and the "exterior front driver door handle" of Lee's vehicle, and compared them to reference samples of DNA taken from Lee and Alec. Only the sample taken from the Kool cigarette butt yielded a result, showing that Alec's DNA sample corresponded to the DNA profile obtained from the cigarette butt.

Det. Roy stated the murder weapon was not recovered by the NOPD, but his review of the Firearm Examination Report revealed that all of the recovered shell casings were fired from the same weapon. However, none of the casings were fired from the gun recovered from Lee's vehicle or from the Alec's mother's vehicle. The ballistics report further showed that the bullet fragments recovered from the scene and Lee's autopsy were consistent with nine-millimeter ammunition.

## ASSIGNMENTS OF ERROR

Defendant assigns four assignments of error for this Court's review: (1) the State presented insufficient evidence to sustain his convictions; 2) conspiracy to commit first degree robbery is not a responsive verdict for conspiracy to commit armed robbery; 3) the district court erred in imposing constitutionally excessive sentences, and in failing to consider the sentencing guidelines of La. Code. Crim.

12

Proc. art. 894.1; and, 4) Defendant's attorney rendered ineffective assistance of counsel at sentencing by failing to file a motion to reconsider sentence to preserve sentencing errors for appeal.

**Errors Patent**

Our review of this matter yields one error patent: Defendant neither waived the twenty-four-hour sentencing delay, or pronounced his readiness for sentencing following the district court's denial of his motion for post-verdict judgment of acquittal, wherein he asserted that his conviction of conspiracy to commit first degree robbery was non-responsive to the charged offense of conspiracy to commit armed robbery.[8]

Article 873 of the Louisiana Code of Criminal Procedure provides in pertinent part that:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

The Louisiana Supreme Court has held that a defendant's declaration of his or her readiness for sentencing may operate as an express waiver of the twenty-four-hour sentencing delay, but a defendant's mere participation in the sentencing hearing, which may be considered an implicit waiver, is distinguishable from the express waiver required pursuant to La. Code Crim. Proc. art. 873. *State v. Kisack*, 16-0797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205.

In the matter *sub judice*, Defendant did not file a motion in arrest of judgment; however, "[t]his court has held that the same twenty-four [hour] delay is

---

[8] Defendant also raises this issue in his second assignment of error.

13

required in the case of the denial of a motion for post-verdict judgment of acquittal." *State v. Edgar*, 12-0744, p. 12 (La. App. 4 Cir. 9/18/13), 140 So.3d 22, 31 (citing *State v. Green*, 10-0791, pp. 19-20 (La. App. 4 Cir. 9/28/11), 84 So.3d 573, 586). According to the court minutes, the district court denied Defendant's motion for post-verdict judgment of acquittal on December 9, 2022, the same day Defendant was sentenced. Furthermore, neither the December 9th hearing nor sentencing transcript reveals that Defendant waived the twenty-four-hour sentencing delay following the district court's denial of his motion, or that the district court asked Defendant if he was prepared for sentencing.

In certain situations, Louisiana courts have held that "an error in failing to observe the statutory sentencing delay may still be found harmless." *Kisack*, 16-0797, p. 7, 236 So.3d at 1205-06. *See, e.g.*, *State v. White*, 404 So.2d 1202, 1204 (La. 1981) (When "there has been no objection raised regarding the sentence imposed . . . and no showing or suggestion that defendant was prejudiced," the failure to observe the sentencing delay does not require a remand for resentencing.); *State v. Moffett*, 17-0769, p. 3 (La. App. 4 Cir. 6/13/18), 247 So.3d 908, 911 (error in failing to observe sentencing delay found harmless notwithstanding the absence of an express waiver where "the sentence was imposed two months after the defendant's conviction, the defense counsel provided a letter of mitigation prior to sentencing, and the sentence imposed by the trial judge was half of the maximum sentence allowed by law.").

Nevertheless, the Louisiana Supreme Court has reasoned that a finding of harmless error is difficult to reach when defendants, who are facing a maximum sentencing range, receive the maximum sentence, or when a defendant, who did not waive the sentencing delay, thereafter challenges his or her sentence. *Kisack*,

14

16-0797, pp. 7-8, 236 So.3d at 1206; *State v. Francis*, 19-0227, p. 1 (La. 4/29/19), 268 So.3d 289.

Here, Defendant objected to the district court's imposition of the maximum allowable sentences for each of his convictions and challenged his sentences as excessive on appeal. Therefore, the district court's failure to adhere to the sentencing delay is not harmless, notwithstanding that there was a six-week delay between Defendant being convicted and his sentencing. Accordingly, we reverse Defendant's sentences and remand this matter for the district court to conduct another sentencing hearing as Defendant should not have been sentenced at all without observing the twenty-four-hour delay period. Considering that this error patent necessitates a remand for the district court to correct its sentencing error, we pretermit discussion of Defendant's assignments of error three and four as the remand of this matter for re-sentencing is dispositive of those assignments of error.

**Insufficient Evidence**

Defendant's first assignment of error is that the State presented insufficient evidence to sustain his convictions for negligent homicide and conspiracy to commit first degree robbery.

In reviewing a claim for insufficiency of the evidence, the United States Supreme Court has held:

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a

> legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (Emphasis in original).

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

"Upon review of the record as a whole, if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence must be adopted." *State v. Bradley*, 18-0734, p. 4 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 97 (citation omitted). Moreover, this Court has further held that "[c]onflicting statements as to factual matters is a question of weight of the evidence, not sufficiency" for "the trier of fact who may accept or reject, in whole or in part, the testimony of any witness." *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306 (internal citations omitted). "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id.*

"Pursuant to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court must determine that the evidence, viewed in the light most favorable to the prosecution, 'was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt.' " *State v. Francis*, 18-0482, p. 3 (La. App. 4 Cir. 12/28/18), 318 So.3d 823, 826 (quoting *State v. Neal*, 00-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657). The *Francis* Court further explained the requirements for using circumstantial evidence to prove the commission of a crime:

> When circumstantial evidence is used to prove the commission of an offense, "assuming every fact proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. 15:438. This statutory test (of La. Rev.

Stat. 15:438) "works with the *Jackson* constitutional sufficiency test to evaluate whether all the evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 00-0674, p. 9, 796 So.2d at 657 (citation omitted). It is not a separate test from the *Jackson* reasonable doubt standard but, rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright*, 445 So.2d 1198, 1201 (La.1984).

A fact finder's decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. *State v. James*, 2009-1188, p. 4 (La. App. 4 Cir. 2/24/10), 32 So.3d 993, 996.

*Id.,* 18-0482, pp. 3-4, 318 So.3d at 826-27.

"Stated differently, 'the reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the state and there is no extant reasonable hypothesis of innocence.' " *State v. Mealancon*, 21-0119, p. 7 (La. App. 4 Cir. 12/22/21), 334 So.3d 792, 798 (quoting *State v. Green*, 449 So.2d 141, 144 (La. App. 4 Cir. 1984) (citation omitted). "If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty." *Id.* (citing *State v. Captville*, 448 So.2d 676, 680 (La. 1984)).

**Negligent Homicide**

The jury found Defendant guilty of the lesser offense of negligent homicide in this case,[9] but he was indicted for second-degree murder, which is defined in

---

[9] La. Rev. Stat. 14:32(A) defines negligent homicide pertinently as "[t]he killing of a human being by criminal negligence." The statute also provides that "[t]he violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence." La. Rev. Stat. 14:32(B). Criminal negligence is defined pertinently as "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances," notwithstanding the absence of either specific or general criminal intent for criminal consequences to result from his act or failure to act. La. Rev. Stat. 14:12; La. Rev. Stat. 14:10.

pertinent part as "the killing of a human being…when the offender is engaged in the perpetration or attempted perpetration of, [*inter alia*], armed robbery [or] first degree robbery…even though he has no intent to kill or inflict great bodily harm." La. Rev. Stat. 14:30.1.

Defendant, however, failed to object to the inclusion of negligent homicide as a responsive verdict to the charge of second-degree murder. In instances where a defendant fails to lodge a contemporaneous objection, "when the trial judge may take action, a reviewing court may affirm if the evidence supports a conviction of the greater offense." *State v. Pleasant*, 10-1533, p. 7 (La. App. 4 Cir. 5/18/11), 66 So.3d 51, 56 (citations omitted). *See also State v. Miller*, 15-720, p. 6 (La. App. 3 Cir. 2/3/16), 185 So.3d 264, 268 [where "a rational trier of fact could reasonably find the evidence supports a conviction for second-degree murder … the jury could conclude the State proved the essential elements of negligent homicide beyond a reasonable doubt."]. Here we find that the evidence supports Defendant's conviction for the greater offense of second-degree murder.

Negligent homicide is "[t]he killing of a human being by criminal negligence." La. Rev. Stat. 14:32(A). "The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence." La. Rev. Stat. 14:32(B). Criminal negligence is defined pertinently as "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances," notwithstanding the absence of either specific or general criminal intent for criminal consequences to result from his act or failure to act. La. Rev. Stat. 14:12; 14:10.

18

Second-degree murder is defined in pertinent part as "the killing of a human…when the offender is engaged in the perpetration of or attempted perpetration of…armed robbery…even though he has no intent to kill or to inflict great bodily harm." La. Rev. Stat 14:30.1. "Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. Stat. 14:30.1(B).

Additionally, "all persons concerned in the commission of a crime…whether they directly commit the act constituting the offense, aid and abet in its commission…are principals." La. Rev. Stat. 14:24. Reviewing courts look "to evidence of actions preceding a given offense, during the offense, and after the offense," when "reviewing a defendant's conviction as a principal." *State v. Jackson*, 14-0954, p. 2 (La. App. 4 Cir. 3/11/15), 163 So.3d 98, 100, citing *State v. Quac Tran*, 08-1103, p. 9 (La. App. 4 Cir. 8/13/09), 18 So.3d 165, 170.

In the instant matter, notwithstanding the jury's responsive verdict of negligent homicide, the record reflects that Defendant's actions were more extreme than just acting with "disregard of the interest of others" such that his conduct amounted "to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances," and further indicate that Defendant acted with either specific or general criminal intent for criminal consequences resulting from his actions or inactions.

Defendant participated with his cohorts in hunting Lee down with a firearm to rob him. This led to Lee's murder at the hands of one of Defendant's cohorts when Lee would not surrender the contents of his pockets to them. However, the district court—as a result of the jury's responsive verdict— was permitted to consider the significant reduction in the statutorily allowable punishment. *See State*

*v. White*, 48,788, p. 4 (La. App. 2 Cir. 2/26/14), 136 So.3d 280, 282 [where the Second Circuit determined that evidence presented at trial supported a second-degree murder verdict and further held that the sentencing court may take into consideration the great benefit the defendant derived from the jury's return of the lesser verdict of manslaughter]. Defendant greatly benefited here by being convicted of second-degree murder and, therefore, being sentenced to five years imprisonment at hard labor instead of life imprisonment. This assignment of error is without merit.

**Conspiracy to Commit First Degree Robbery**

Defendant asserts that the State failed to present "evidence of a single conversation, text, or phone call" and therefore, failed to establish that he entered into an agreement "to commit any crime, particularly a robbery, or that any criminal plans were discussed or made." We disagree.

"First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon." La. Rev. Stat. 14:64.1(A).

Criminal conspiracy is "the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that … one or more of such parties does an act in furtherance of the object of the agreement or combination." La. Rev. Stat. 14:26. "The word 'combination' does not obviate the necessity for at least two parties to possess malefic intent for a conspiracy to exist." *State v. Joles*, 485 So.2d 212, 214 (La. App. 2d Cir. 1986). In fact, the "pertinent statute requires criminal intent in the mind of at least two persons, and, of course, an overt act in furtherance of the enterprise, for a conspiracy to exist." *Id.* "This

Court has found that direct or circumstantial evidence may be used to prove criminal conspiracy." *State v. Robinson*, 23-0058, p. 28 (La. App. 4 Cir. 9/4/24), 401 So.3d 809, 828, *writ not considered*, 24-01306 (La. 12/27/24), 397 So.3d 1220, and *writ denied*, 24-01198 (La. 2/25/25), 401 So.3d 658 (citing *State v. Hickerson*, 19-1077, p. 16 (La. App. 4 Cir. 12/30/20), 312 So.3d 1124, 1136)).

Additionally, "[s]pecific intent is an essential element of criminal conspiracy". *State v. Toby*, 23-00722, p. 3 (La. 10/25/24), 395 So.3d 831, 834, *reh'g denied*, 23-00722 (La. 12/12/24), 397 So.3d 424. Specific intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. 14:10(1).

Louisiana courts have held that circumstantial evidence that the perpetrators intended to commit the underlying offense together is sufficient to show that they agreed. *Id.*, 23-00722, p. 5, 395 So.3d 831, 834-35 [wherein the Louisiana Supreme Court held that jurors were not foreclosed from inferring from the circumstantial evidence that two brothers conspired to commit murder "[s]imply because there was no direct evidence, such as the precise content of a text message to show an agreement."].

As noted above, following the confrontation with Tank, Lee and his friends hurriedly departed Bruno's. According to Aislinn, Lee returned to his truck with an additional quantity of marijuana. Shortly thereafter, as Lee was seated in his vehicle with Aislinn, Emily, Samantha and Madeline, Lee's truck was surrounded by Defendant, who was armed, along with Tank, Alec and Caiden, one of whom who was also armed. Trial testimony from Aislinn, Samantha, Emily, Vivian and Madeline reveals that at least two of the assailants brandished firearms, one of

whom being Defendant. Caiden identified Defendant as one of the four perpetrators and recalled the clothing he wore the night of Lee's murder. Furthermore, the jurors heard an audio recording of the attack, where one of the assailants demanded Lee to open his pockets.

The testimony and evidence presented at trial reveals that Lee and Tank participated in a botched drug deal that initially prompted Lee to confront Tank— as he was with Defendant, Alec, and Caiden at Bruno's— over the missing quantity of marijuana. However, the situation ultimately escalated when Tank and his companions confronted and murdered Lee.

Together, the testimony and circumstantial evidence supports the rational inference that after a failed drug deal inside Bruno's, Defendant and his associates acted in concert to take something of value from Lee when they left the bar as a group before collectively trailing Lee and his friends to Lee's truck. They surrounded the truck armed with at least two firearms to either intimidate or exert force against Lee with the firearms. Defendant's actions as well as those of his companions evidence that they collectively acted with malefic intent to rob Lee at gunpoint. This showing is sufficient to constitute an overt act in pursuit of the shared goal of robbing Lee. Accordingly, Defendant's claim that the State failed to present sufficient evidence that he conspired to commit first degree robbery is without merit.

**Responsive Verdict**

Defendant asserts in his second assignment of error that the offense of conspiracy to commit first degree robbery is not a responsive verdict to conspiracy

22

to commit armed robbery, and his conviction therefor must be reversed.[10] He argues that while first degree robbery is a responsive verdict to armed robbery, conspiracy to commit armed robbery is not listed as a responsive verdict to conspiracy to commit armed robbery in La. Code Crim. Proc. art. 814. He further asserts that the commission of conspiracy to commit first degree robbery necessitates an agreement by the parties to lead the victim to believe they were armed, which would require a discussion of the ways in which that could be done, whereas conspiracy to commit armed robbery may not require such a discussion because the presence of the gun itself would lead the victim to believe the offenders were armed.

"Lesser and included offenses are those in which all of the essential elements of the lesser offense are also essential elements of the greater offense charged." *State v. Price*, 17-0520, p. 3 (La. 6/27/18), 250 So.3d 230, 232. In other words, "if any reasonable state of facts can be imagined wherein the greater offense is committed without perpetration of the lesser offense, a verdict for the lesser cannot be responsive." *Id.* (citation omitted). In addition to reviewing the essential elements of lesser offenses, Comment C of La. Code Crim. Proc. art. 814 further provides a second test:

---

[10] While Defendant admits his failure to lodge an objection to the inclusion of the responsive verdict of conspiracy to commit armed robbery, he asserts that this issue was preserved because he raised the issue in his motion for a post-verdict judgment of acquittal, which the district court denied. The record does not include either the hearing transcript or the district court's reasons for its ruling. It is also unknown whether Defendant objected to any of the jury instructions or the responsive verdicts included therein because the record is also absent of any discussion of special jury charges, notwithstanding a notation in the docket master on November 17, 2021, that "special jury instructions will be discussed after the conclusion of voir dire." Nevertheless, "the return of a nonresponsive verdict constitutes an error patent reviewable even in the absence of a defense objection." *State v. McGhee*, 17-1951, p. 1 (La. 9/21/18), 252 So.3d 895, 895. Accordingly, Defendant is entitled to his right to review on this issue.

> . . . Second, the generic offenses must be segregated from the non-generic offenses. To do this, the genus of the crime charged in the indictment is determined, and each of the lesser crimes compared with it. If the lesser crime is of the same generic class, it is responsive; if not, it is not responsive.

"If the lesser offense meets both of these tests it may be the subject of a valid and 'responsive' verdict." *Id*. (quoting Comment, 5 La.L.Rev. 603, 609 (1944)).

As noted above, the elements of a criminal conspiracy are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. *State v. Ordon*, 18-295, p. 7 n. 14 (La. App. 5 Cir. 11/7/18), 259 So.3d 620, 627. Moreover, armed robbery is defined as "taking anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. Rev. Stat. 14:64. Similarly, first degree robbery is defined as "taking anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon." La. Rev. Stat. 14:64.1. The only distinction between armed robbery and first-degree robbery is whether the offender is armed with a dangerous weapon or whether the offender leads the victim to believe he is armed with a deadly weapon.[11] Therefore, pursuant to *Price*, we find that the essential elements of first-degree robbery are elements of armed robbery and further, that first degree robbery is of the same generic class as armed robbery.

---

[11] We note that attempted armed robbery is included in La. Code Crim. Proc. art. 814(30), and includes as a responsive verdict attempted first degree robbery. However, art. 814 does not include conspiracy to commit armed robbery nor its responsive verdicts.

The State, however, is not required to present any evidence of a discussion or conversation among the conspirators at all, rather the State must show that the conspirators combined for the specific purpose of committing the underlying offense together; the actual agreement itself may be tacit, or inferred by the actions of the conspirators to sustain a conviction therefor. As explained above, Louisiana courts have held that circumstantial evidence that the perpetrators intended to commit the underlying offense together is sufficient to show that they agreed. *See Toby*, 23-00722, p. 5, 395 So.3d at 835.

Accordingly, the State did not have to prove that Defendant and his companions actually discussed the possible ways they could potentially lead Lee to believe they were armed with a dangerous weapon to sustain a conviction for conspiracy to commit first degree robbery. Furthermore, considering that the offense of conspiracy to commit armed robbery can be committed without proof that the conspirators actually engaged in a discussion it logically follows that the offense of conspiracy to commit first degree robbery can also be committed without evidence that the conspirators engaged in a discussion. Moreover, conspiracy to commit first degree robbery is of the same generic class as conspiracy to commit armed robbery.

Defendant fails to demonstrate that his conviction for conspiracy to commit first degree robbery is un-responsive to the charged offense of conspiracy to commit armed robbery. This assignment of error is without merit.

**DECREE**

For the foregoing reasons, we affirm Defendant's convictions of negligent homicide and first-degree robbery. Defendant's sentences are hereby vacated, and this matter is remanded for resentencing.

**AFFIRMED IN PART;**
**VACATED IN PART**
**AND REMANDED**